THE STATE v. EDMOND J. HART, *alias* EDDIE NEARY, Appellant.

### Division Two, February 18, 1922.

1. **EVIDENCE: Improper Question: No Objection at Time: Hurtful Answer.** A defendant cannot sit by and permit a question to be answered and then, without preliminary objection, except to the answer and thereby preserve the matter for review. Where the State's counsel asked the officer if he said anything to defendant at the time he arrested defendant, and the officer answered, "I says, 'You are one of the fellows in the South Side Bank robbery,' and he says, 'Don't kill me, I was there,'" no objection being made at the time, but defendant's counsel, after asking the witness some questions in explanation of the situation, moved to strike out defendant's statement that "I was there" and the court sustained the motion and directed the jury to disregard the statement, the defendant on appeal, not having objected to the question, cannot complain of the answer.

2. **CONFESSION: Admissibility.** A confession, reduced to writing and signed by defendant a few hours after his arrest, in order to be admissible in evidence at his trial, must be, *first,* entirely voluntary; *second,* to exclude it on the ground that it was not voluntary, it must affirmatively appear that some inducement to confess was held out to him by or in the presence of some one in authority; *third,* it does not matter that the confession was elicited from him through questions of an officer or person in authority, or that such questions assumed the guilt of defendant; and, *fourth,* where the confession was induced by some influence like a hope of clemency, or a fear of punishment, or violence from officers or a mob, it is inadmissible.

State v. Hart.

3. ———: ———: Continued Fear. Whether or not the influence exerted and the fear inspired in defendant at the time he was arrested was still with him when he confessed to the same officer a few hours later, depends upon the circumstances under which the confession made at the time of his arrest was obtained and its relation to the subsequent written one offered in evidence, and upon the character and experience of the accused. Where the officer burst in a door of a house and found defendant upstairs in bed, his arm wounded, he knocked another man down who attempted to reach for a gun, and then drawing his gun on defendant, said, "You are one of the fellows in the South Side Bank robbery," to which defendant replied, "Don't kill me, I was there," a written and signed confession made by defendant a few hours later to the same officer, at police headquarters, in which he described the robbery and stated he took part in it and was shot in the arm and neck while assisting into an automobile one of the other robbers who had been shot, was admissible in evidence, (1) the only evidence as to what occurred when the confession was reduced to writing being offered by the State, which showed it was entirely voluntary, and (2) the evidence further showing that defendant was not weak in character, but had the hardihood to attempt to rob a bank in broad daylight, the presence of mind under fire to assist a wounded comrade into an automobile and get away, and exercised some ingenuity in concealing his whereabouts and his connection with the crime, and (3) the fear of being shot when he exclaimed "Don't kill me, I was there," being a fear of being shot then, and not at some later time.

4. ———: ———: ———: To Compel Arrest. The drawing of a pistol on defendant to compel him to surrender is not an inducement for him to confess, and it is unreasonable to say that when he confessed three or four hours later he was still afraid of being shot.

5. ———: Harmless. It can scarcely be said that defendant was harmed by the admission of his written confession in evidence, where other witnesses have testified, before it is offered in evidence, that, before he made the confession, they had heard him state every essential fact contained in the written statement.

6. LEADING QUESTIONS. The allowance of improper leading questions is not reversible error if all the facts elicited by them were fully developed by other and competent testimony.

7. EVIDENCE: Conclusion: Suspicious Looking. A statement by the officer that "I saw a house with one light, which looked suspicious," even if a conclusion of the witness, was harmless, the time being night and the defendant having been arrested in said house.

8. **ARGUMENT TO JURY: Reprimand.** A reprimand of an attorney for a wrongful argument to the jury is likely to be injurious to the party reprimanded, and should go no further than is necessary to counteract the prejudicial effects of objectionable remarks. In the prosecution of a defendant for murder, the prosecuting attorney said the officer "went out and located this man at Burke's place, a notorious joint," which remark, upon an objection by defendant and a request for a reprimand, was stricken out, and the jury instructed not to consider it and the attorney ordered to keep within the record. *Held*, that the incident was not sufficient to require a discharge of the jury—a matter largely within the discretion of the trial court—nor can it be said that the course pursued by the court did not properly neutralize the bad effect of the remark.

9. ———: **Companion of Defendant: Conclusion from Evidence.** A conclusion drawn from facts in evidence by the prosecuting attorney in his argument to the jury is not error. Where the officer, at the time of the arrest, found in the same room with defendant another man who attempted to shoot him, it is not improper for the prosecuting attorney to refer to such other man as the "companion" of defendant.

10. ———: **Irritated Interruptions.** Where the prosecuting attorney had been aggravated by repeated interruptions and disallowed objections to his remarks to the jury, a statement by him to the court, "You have not jacked me up a single time, and he has made twenty objections already; if I had done anything improper you know your Honor would have done it," was scarcely a proper remark to make in a moment of irritation, but having been ordered stricken out, it cannot be held that the court, who understood the circumstances which called it forth, should have gone further and reprimanded the attorney.

11. ———: **Violence in Arrest: Danger to Officer: Conclusion Drawn from Evidence.** Where the officer had gone to the house where he supposed bank robbers were and who in the attempted robbery had killed the cashier, and when he got in the room in which defendant and another man were said other man attempted to seize his gun lying on a dresser, whereupon the officer knocked him down, and pointing his pistol at defendant commanded him to surrender, and defendant's counsel, in his argument to the jury, had contended that the method of making the arrest was too harsh, remarks made by the prosecuting attorney in his closing argument that such officers "take their lives in their hands" and "I don't think this officer did what I would have done; I would not put my life agains a man of that character; I would have killed him then; they have no right to live," were based upon the evi-

State v. Hart.

dence, and the inference that the officer was taking his life in his own hands was warranted, and the statement of the rougher treatment the attorney would have administered was likewise drawn from the evidence, and there was therefore no error in the remarks.

12. ———: **Admonition to Duty: Prevalence of Crime.** It is not improper for the prosecuting attorney to refer to the prevalence of crime in the community, whether it appears from the evidence or is a matter of common knowledge, and with such in view to urge the jury to do their duty, and to argue that it would be a reflection upon them to fail to convict under the evidence before them— and such an admonition in this case, under such circumstances, was not error.

13. **CONSPIRACY: Robbery: Murder: Instructions.** It is not necessary to prove all the terms of a conspiracy in order to justify an inference of its existence. Where defendant knew the day before of the projected plan to rob a bank, and on the morning the robbery was attempted joined the robbers for the purpose of carrying out that intention, in which the cashier was killed, and there was evidence tending to show that he was one of the robbers who entered the bank when the shooting began, in which apparently all engaged, instructions telling the jury that there is no evidence that defendant shot and killed the deceased, or that he had prior to the shooting entered into a conspiracy to rob the bank, or that he was aiding, assisting and abetting the robber who fired the fatal shot, should not be given. Being concerned in the robbery, he was guilty of murder, whether or not he actually fired the shot which killed the cashier.

14. **INSTRUCTION: Murder in Connection with Robbery: In Second Degree: Manslaughter.** Murder committed in an attempt to commit a felony is murder in the first degree, the attempt to commit the felony being the legal equivalent of premeditation and deliberation; and where defendant and other robbers, in an attempt to rob a bank, killed the cashier, no instructions for murder in the second degree or for manslaughter should be given, because there is no evidence upon which to base them.

15. ———: **On Circumstantial Evidence.** Instructions on circumstantial evidence should be refused where there is direct and positive evidence of eye witnesses of the crime.

16. ———: **Self-Defense.** Where the defendant and other robbers came into the bank with guns in their hands and immediately began shooting, there is no ground for an instruction on self-defense, on the theory that the cashier, who was killed, fired the first shot.

17. ———: **Failure to Define Homicide.** Where the court accurately defined murder in the first degree, and that was the crime which the evidence shows defendant had committed, it committed no error in failing to define homicide.

18. ———: **Failure to Define Robbery in Murder Trial.** In the trial of a defendant for murdering the cashier during an attempt to rob a bank, it is not necessary to define robbery. Robbery was a collateral issue, and no instruction relating to it is necessary unless the defendant requests it.

Appeal from Jackson Criminal Court.—*Hon. Edward E. Porterfield,* Judge.

AFFIRMED.

*Clarence Wofford* and *Bert S. Kimbrell* for appellant.

(1)   The court erred in admitting in evidence the alleged written statement of the defendant, for the reason that said purported statement was not his free and voluntary statement, but was made under duress and through fear and compulsion. State v. Brockman, 46 Mo. 570; State v. Jones, 54 Mo. 478; State v. Brown, 73 Mo. 631; State v. Patterson, 73 Mo. 695; State v. Moore, 160 Mo. 461; State v. Keller, 263 Mo. 556; State v. Powell, 258 Mo. 250. (2)   The court erred in permitting the assistant prosecuting attorney, over the objection and exception of the defendant, to say to the jury in the closing argument for the State: "I tell you the police when they undertake to apprehend these men take their lives in their hands, and I say that brave officer who sat on the stand yesterday took his life in his hands when he went to serve you people. When he struck that man he was grabbing for that gun. I don't think Phelan did what I would have done. I would have done worse than that. I would not have put my life against a man of that character. I would have killed him then. They have no right to live. They forfeit all their rights to live when they go about in the community committing that kind of crime." State v. Stegner, 276 Mo. 440; State v. Miller, 263 Mo. 336; State v. Schnei-

ders, 259 Mo. 330; State v. Helton, 255 Mo. 182; State v. Webb, 254 Mo. 434; State v. Welman, 253 Mo. 316; State v. Brown, 247 Mo. 728; State v. Hess, 240 Mo. 158; State v. Dietz, 235 Mo. 341; State v. Ferrell, 233 Mo. 457; State v. McGrath, 228 Mo. 428; State v. Clancy, 225 Mo. 659; State v. Clapper, 203 Mo. 552; State v. Wigger, 196 Mo. 100; State v. Spivey, 191 Mo. 112. The court erred in refusing to reprimand Edward J. Curtin, assistant prosecuting attorney, at the request of defendant, for saying to the jury in the closing argument for the State: "Gentlemen of the jury, this case is going to pass to you twelve men now. Now you jurors may send out a warning or encouragement, whichever way you see fit. If there is any man on this jury that will stand for this sort of thing then I am disappointed in my fellow men." Authorities cited above. (4) The court erred in submitting the case to the jury upon the sole and only hypothesis that the defendant in person committed the felonious act charged, there being no evidence that defendant in person shot and killed the deceased. (5) Robbery is not defined; the jury were not instructed as to what in law constituted the perpetration, or the attempt to perpetrate, the offense of robbery; homicide is not defined; there was no evidence upon which to base the instruction, there being no evidence of the consummated offense and none of the attempt to perpetrate the offense. (6) The court erred in refusing to give to the jury at the request of defendant the following instruction: "The court instructs the jury that there is in this case no evidence that the deceased was shot and killed by the defendant. (7) The court erred in refusing to instruct the jury that "there is in this case no evidence that prior to the shooting of the deceased the defendant and another or others had entered into an agreement and conspiracy to rob the officials, employees or servants of the bank mentioned in evidence." (8) The court erred in refusing to instruct the jury that "there is in this case no evidence that deceased was shot and killed by one C. B. Johnson and no evidence that the defendant was present aiding,

abetting and assisting said Johnson in the shooting and killing of deceased." (9) The court erred in refusing to instruct the jury upon the law of murder in the second degree, as requested by defendant. (10) The court erred in refusing to instruct the jury at the request of defendant upon the law of manslaughter. (11) The court erred in refusing to instruct the jury at the request of the defendant and over his exception thereto as to the law of circumstantial evidence. (a) As applied to the whole case. (b) As applied to the subject of an agreement or conspiracy to rob the officials or employees of the bank. (c) As applied to the subject of homicide in the attempt to perpetrate the offense of robbery. (d) As applied to the subject of the killing of the deceased in furtherance of a conspiracy to rob the officials or employees of the bank. State v. Moxley, 102 Mo. 375; State v. Crone, 209 Mo. 331; State v. Bobbitt, 215 Mo. 43; State v. Barton, 214 Mo. 323; State v. Hubbard, 233 Mo. 84; State v. Stegner, 276 Mo. 440; State v. Fitzgerald, 201 S. W. 86. (12) The court erred in refusing to instruct the jury as requested by defendant upon the law of self-defense, and as to the facts and circumstances under which defendant was deprived of or might lawfully exercise the right of self-defense under the testimony as developed. State v. Stephens, 96 Mo. 638; State v. Bidstrup, 237 Mo. 273; State v. Wilson, 242 Mo. 504. (13) The court erred in refusing to instruct the jury at the request of defendant as to the law of conspiracy as applied to the evidence in the case, and as to the facts which must be found by the jury before the defendant could be held criminally liable for the shooting and killing of the deceased by another or others. State v. Hockam, 95 Mo. 332; State v. Darling, 216 Mo. 450; State v. Lewis, 273 Mo. 518; State v. Hill, 273 Mo. 339. (14) There being no evidence that defendant in person committed the felonious act charged, the court erred in refusing to instruct the jury to find the defendant not guilty, at the close of all the evidence, as requested by defendant, the case not having been submitted to the jury upon the hypothesis

that another or others shot and killed the deceased with defendant aiding, abetting and assisting, nor upon the hypothesis of a conspiracy to kill or rob and the killing of deceased by another or others in furtherance of such conspiracy.    State v. Garrett, 276 Mo. 312;    State v. Miller, 156 Mo. 86.

*Jesse W. Barrett,* Attorney-General, and *Albert Miller,* Assistant Attorney-General, for respondent.

(1)    The court did not commit error in admitting in evidence the written statement by defendant after he was arrested.    Voluntary statements made by defendant at the time of his arrest are competent testimony, although he was not advised that he was under arrest, and although they were made in answer to questioning by the officer.    State v. Green, 229 Mo. 650;    State v. Daly, 210 Mo. 664, 676;    State v. Barrington, 198 Mo. 23, 109;    State v. Wertz, 191 Mo. 569;    State v. Schmidt, 137 Mo. 266;    State v. Schmidt, 136 Mo. 645;    State v. Elliott, 90 Mo. 350.    (2)    The court did not commit error in permitting counsel for the State to propound leading questions to Chief Phelan.    The examination of witnesses and the manner and method of eliciting testimony in the trial of a case is largely in the discretion of the trial court, and unless it is manifest that this discretion is abused a judgment in the cause will not be disturbed upon that ground.    State v. Wertz, 191 Mo. 587;    State v. Whalen, 148 Mo. 290;    State v. Napper, 141 Mo. 405;    State v. Bateman, 198 Mo. 222;    State v. Burgess, 259 Mo. 392.    (3)    Error was not committed by conduct of counsel in their argument to the jury.    These arguments are sustained by the evidence, are within the record, legitimate and warranted by the facts and circumstances surrounding this case.    State v. Rasco, 239 Mo. 581;    State v. Hilton, 248 Mo. 534;    State v. Johns, 124 Mo. 386;    State v. Musick, 101 Mo. 273;    State v. Zumbunson, 86 Mo. 111;    State v. Hibler, 149 Mo. 484;    State v. Summar, 143 Mo. 234.    The complaint, if error, was cured by the action

of the court in sufficiently reprimanding counsel. State v. Baker, 209 Mo. 450. (4) When murder is committed in the perpetration of the crime of robbery it is wholly unnecessary to do more than to make the charge in the ordinary and usual way for murder in the first degree, and then show the facts in evidence, and, if they establish that the homicide was committed in the perpetration of such robbery, this suffices. Sec. 3230, R. S. 1919; State v. Meyers, 99 Mo. 113; State v. Foster, 136 Mo. 655; State v. McGinnis, 158 Mo. 122; State v. Kennedy, 177 Mo. 119; State v. Collins, 181 Mo. 261; State v. Ruck, 194 Mo. 433; State v. Vaughn, 209 Mo. 20; State v. Bobbitt, 215 Mo. 33; State v. Carroll, 232 S. W. 702. (5) Appellant is not charged with the crime of conspiracy. He is charged with murder, and the conspiracy is only an incident. Sec. 3490, R. S. 1919; State v. Carroll, 232 S. W. 699. (6) The court did not commit error in the giving of instructions. Sec. 3230, R. S. 1919; State v. Barrington, 198 Mo. 96. (7) The court did not commit error in refusing to give instructions asked by defendant. These instructions were correctly refused, either upon the ground that the giving of them was not warranted by any evidence in the case, or upon the ground that the testimony upon which they were predicated was so inconsistent with the physical facts disclosed by the record as to justify the court in refusing them. State v. Vaughn, 200 Mo. 22. (8) The instructions on murder in the second degree and manslaughter were properly refused, as there was no evidence on which to base them. Sec. 3230, R. S. 1919; State v. Lewis, 273 Mo. 532; State v. Carroll, 232 S. W. 699; State v. Garrett, 276 Mo. 302, 312; State v. Rasco, 239 Mo. 582; State v. Vaughn, 200 Mo. 22. (9) The court did not commit error by refusing to instruct on the law of circumstantial evidence. It is only when conviction is sought on circumstantial evidence alone, or upon evidence principally circumstantial, that such instruction becomes necessary. State v. Ward, 261 Mo. 149; State v. Hubbard, 223 Mo. 80; State v. Bobbitt, 215 Mo. 10. (10) The court did not commit error in

refusing to instruct the jury as to the law on conspiracy. (11) The court did not commit error in refusing to give defendant's instruction in the nature of a demurrer to the evidence at the close of all the evidence in the case. The record discloses that there is substantial evidence upon which to submit the case to the jury. State v. Fields, 234 Mo. 627; State v. James, 216 Mo. 407; State v. Wooley, 215 Mo. 687.

WHITE, C.—The defendant, with one Charles B. Johnson and one Frank McFarland, was charged by indictment with murder in the first degree in killing one Glen M. Shockey, March 9, 1920. The defendant was found guilty as charged, and his punishment assessed at life imprisonment in the penitentiary.

Glen M. Shockey was cashier of the South Side Bank. About the time the bank was opened, a few minutes after nine o'clock in the forenoon of March 9, 1920, Shockey was in the bank, as was M. J. McNellis, vice-president of the bank, Miss Eva Lathrop, a stenographer, Henry Strohmeyer, a bookkeeper, and James Monroe Smith, a janitor.

McNellis, as witness for the State, testified that he saw approaching the door four men in close formation, with their hands in their pockets. He suspected something wrong, walked hurridly to the door and told them that the bank was not open for business. The men on the left in front roughly pushed McNellis back through the door; the man on the right went on into the bank. At that instant a shot was fired. The first man to enter was described by McNellis as a very short, slight man of sandy complexion, resembling defendant. As soon as McNellis heard the first shot he turned quickly, and felt a dead weight on his shoulders. He dropped to the floor and heard someone say, "Get him." The slight man who had entered first dropped to the floor at the same time; a number of shots immediately followed. The four men then rushed out of the bank to an automobile standing near, and Strohmeyer, who was in the rear,

came around to the front, went out the front door, and fired several shots as the men retreated. One of them dropped, apparently from his shot, and was lifted into the automobile by the other man, who then drove away in a Cadillac car.

Shockey had a number of bullet wounds in his body —in his chest, arms and hips, about a half dozen altogether—and died almost immediately.

Miss Lathrop testified that she was sitting at her desk within five feet of Shockey. The first thing she noticed was some scuffling; she thought it was high school boys, some of whom usually stood out in front of the bank until about school time. She saw Mr. McNellis rush to the door and heard him say, "The bank is not open for business." Mr. McNellis grappled with a man who was trying to enter. Mr. Shockey saw that, and as he rushed to the paying and receiving window in front someone said, "Get him," and she heard a shot. How many shots were fired before Mr. Shockey fell she did not know; they were fired in quick succession; Mr. Shockey fell within a few feet of her and died in a few minutes. His revolver showed he had fired five shots before he fell.

James Monroe Smith, the janitor, described how Mr. McNellis apparently went to shut the door when the boys rushed up, how they pushed McNellis back against the wall, one man stayed at the door and three men rushed in and said, "There he stands, get him." They raised their revolvers, and the first shooting came from the door. Someone pushed him and knocked him down, and he didn't know anything more until it was over.

Henry Strohmeyer, the bookkeeper, heard a sort of scuffling at the door, but paid little attention to it. He saw Mr. Shockey grab his gun, heard one of the men holler, "Get him;" he couldn't see very well from where he was; he saw the shooting and saw Mr. Shockey doing his part. He had his gun on the desk, he got it and went out of the front door; the men then were getting into the car, he fired a shot, "dropping" one of the men, and

fired several more shots after the retreating automobile.

One S. B. Sturgis, witness for the State, was standing about thirty feet from the bank when the shooting occurred; he heard the noise of the men scuffling as they entered the bank. He saw Strohmeyer come out and shoot at them as they retreated; he saw two men getting into the machine, the larger one seemed to have been struck, he was crumpled up and they pulled him into the automobile. When he first saw those men they were coming out of the entrance to the bank, moving toward the car and hustling pretty lively. The witness identified the defendant as one of the two going from the bank toward the motor car.

Officer Phelan, Chief of Detectives, testified he was notified of the murder at the Southside Bank March 9, 1920, and arrested the defendant at 813 East Fourteenth street. Accompanied by detectives he started out, saw a house with a light in it, surrounded it with his men and knocked on the door. He and Detective Meyer "busted in the door." They ran up the stairs and found two men in a room; one man jumped up and attempted to reach for a gun which lay on the dresser, and Phelan knocked him down. The other man, the defendant, was in bed in his underclothes, the officer drew his gun upon him and he surrendered. This was about eleven o'clock at night. The defendant was wounded in the arm. He was taken to headquarters where about four o'clock in the morning he made a statement which was taken down and transcribed by a stenographer, and signed by the defendant, which statement is as follows:

"Exhibit 1

"STATEMENT TAKEN IN OFFICE OF CHIEF PHELAN, CHIEF OF DETECTIVES.

"State of Missouri, }
                    }SS.
County of Jackson. }

"Edmond J. Hart, being of lawful age on his oath states.

"My name is Edmond J. Hart I live in Rochester, N. Y. I am 26 yrs. old I now live at 813 East 14th. On Sunday morning Mch 7th, 1920 I met a man named Cord in a restaurant on 12th St. near Wyandotte St. where Cord made a date with me to meet him Monday evening Mch. 8th at 6:30 p. m. at 12th and Walnut St. where I met him and he made another date with me for Tuesday morning at 8:30 a. m. at 16th & Grand. I met him at 16th & Grand and he was in a car and we drove to 24th & Main where I got out of the car Cord saying he would go get the other fellows and he told me to get on a street car and go to 44th & Main St. where he would meet me and he and the other fellows would look over the bank. Cord met me at 44th & Main and told me to follow the car which I did for about 2 blocks when he got out and told me to take the wheel and told me to drive up near the bank. The men that were in the rear with me got out and met Cord who was in front of the Bank. They went in the Bank and no more than got inside the door before the shots began to fly in the Bank. I was shot in the Arm & Neck while assisting one of the fellows in the car that was shot in the hold up. We drove in a zigzag way around the south part of the city until we came to George & Jim Evans home 4405 Montgall where one of the men I don't know his name went to the door and then told me to come on in. I was put in bed by another man that I did not know and only stayed there a short time and was taken away by a tall slim man driving a Ford car and taken to a rooming house at 813 East 14th St. where I stayed until I was arrested. I do not know any of the men that were implicated in the hold up of the South Side bank near 39th and Main St. on the morning of March 9, 1920. I make this statement of the hold up at the South Side Bank of my own free will because it is the truth. I did not know this was to be a hold up.

"signed EDMOND J. HART.

State v. Hart.

"Witnesses.
"M. S. Cassidy
"S. D. Harrison
"W. J. Doran

"Subscribed to and before a notary public of Jackson county, State of Missouri, this 12th day of March, 1920. My commission expires May 16, 1921.

"Charles P. Keller,
"(Official seal) Notary Public."

The Chief was cross-examined at length as to the circumstances under which the statement was taken. He testified positively that it was entirely voluntary and that no threats, promises or inducements of any kind were held out to the defendant.

The State then introduced evidence to show that the defendant was seen on the day of the murder at 4405 Montgall at the home of one Evans. About ten o'clock in the morning the four men arrived there in a black Cadillac car; one of them appeared to be badly wounded and was carried into the house by two of the other men. Afterwards, about noon, the defendant left the Evans home. It was shown that the car in which the robbers fled from the bank was a black Cadillac car.

Other evidence pertinent to the points urged for reversal will be considered in the opinion. On this evidence the jury returned a verdict of guilty, as stated, and the defendant appealed.

I.  Officer Phelan testified that his men surrounded the house at 813 East 14th Street, broke their way in, rushed into the room where the defendant was in bed **Improper** and a companion present; that he knocked **Question:** the companion down and threw his re-**No Objection.** volver down upon the defendant; then the prosecutor asked him the question:

"Q.  Did you say anything to him [defendant], or he to you? A. Yes sir.

"Q. What did you say? A. I says 'You are one of the fellows in the South Side Bank robbery,' he says, 'Don't kill me, I was there'."

There was no objection at the time, but defendant's counsel asked the witness some questions in explanation of the situation and then moved to strike out defendant's statement that he was there. The court at the moment overruled the objection, but a few minutes later after further examination of the witness in relation to the circumstances ruled it out and instructed the jury to disregard it. The defendant claims the court erred in respect to this matter.

It will be noticed that the defendant didn't object to the question when the officer was asked by the State's counsel, "What did you say?" He waited until the officer answered and told not only what he said but what the prisoner said. Not having objected to the question he could not assign error to the court in allowing the answer. [State v. Carroll, 232 S. W. l. c. 702; State v. Levy, 262 Mo. l. c. 191; State v. Sykes, 191 Mo. l. c. 79; State v. Frisby, 280 Mo. l. c. 83.] In the Frisby Case this court said:

"A party cannot sit by and permit questions to be answered and then, without preliminary objection, except to the answer and thus present a matter for review here."

The only thing that the defendant's counsel could do under the circumstances in allowing the question to be asked and the answer to be made was to move to strike it out. While the court overruled his motion at first, a few minutes later, after further evidence as to the circumstances, he struck it out. Thus the defendant obtained all that he asked, and there was no error in that respect.

II. The appellant assigns error to the ruling of the court in admitting in evidence the confession of the defendant which was reduced to writing and signed by him a few hours after his arrest.

Confession.

In an early case, State v. Patterson, 73 Mo. 695, the opinion, written by SHERWOOD, J., contains an exhaustive review of the authorities relating to the admissibility of confessions. That case has been cited approvingly in numerous later cases as the correct exposition of the law of this State. [State v. Spaugh, 200 Mo. l. c. 597; State v. Green, 229 Mo. l. c. 651; State v. Woodward, 182 Mo. l. c. 410-11; State v. Jones, 171 Mo. l. c. 406; State v. Armstrong, 203 Mo. l. c. 559; State v. Keller, 263 Mo. l. c. 557-8.] . From the discussion in those and in other cases certain rules may be considered well settled:

A confession in order to be admissible must be entirely voluntary.

The fact that the accused is under arrest at the time he makes the confession is not sufficient to exclude his statement as being other than entirely voluntary.

In order to exclude the confession on the ground that it is not voluntary, it must affirmatively appear that some inducement to confess was held out to the accused by or in the presence of someone having authority. The confession is presumed to be voluntary until the contrary appears. [See also State v. Brooks, 220 Mo. l. c. 83; State v. McCord, 237 Mo. l. c. 245; State v. Armstrong, 203 Mo. l. c. 559.] And it does not matter that the confession was elicited through questions of the officer or person in authority, and that such questions assumed the guilt of the defendant. [State v. Brooks, 220 Mo. l. c. 83; State v. Thomas, 250 Mo. l. c. 211.] The test is whether the statement was entirely voluntary. [State v. Smith, 222 S. W. l. c. 458, and cases cited.] Where the confession is induced by some influence like a hope of clemency, or a fear of punishment, or violence from the officers or a mob, it is inadmissible.

In the present case the only evidence as to what occurred when the statement of the defendant was received, reduced to writing and signed by him, was offered by the State. The officer who took the statement was emphatic in his testimony that it was entirely voluntary. He asked the defendant if he desired to make a statement;

the defendant said he did, and the statement was accordingly taken down and signed in the presence of a notary public. The defendant offered no evidence whatever as to what occurred or how the statement was obtained, though several other persons were present at the time. If the officers had admonished the prisoner that it would be better for him to tell the truth, or that it would go hard with him if he didn't tell it, or had held out an inducement, however slight, a different question would be presented. [State v. Keller, 263 Mo. l. c. 557.] The only thing said by the officer was the question whether the prisoner desired to make a statement. The question contained no intimation of any kind as to what would be the effect of making a statement. No inducement of any kind appears.

It is argued, however, with great ingenuity and pertinacity, that the influence exerted and the fear inspired in the defendant when he was arrested a few hours before was still with him at the time the confession was made. Phelan found him in bed in the house at 813 East 14th Street. With his gun in hand the officer addressed him, saying: "You are one of the fellows in the South Side Bank Robbery." The defendant replied, "Don't kill me, I was there." It is argued by the defendant's counsel that the statement was not voluntary, but was elicited through fear inspired by an officer, and that this same influence was with him four or five hours later when at Police Headquarters he made the statement which was reduced to writing. Appellant invokes a rule laid down by some authorities to the effect that when once a confession is obtained under improper influence, the presumption arises that a subsequent confession of the same crime flows from the same influence. This rule is discussed at great length in an elaborate footnote to the case of Ammon v. State, 18 L. R. A. (N. S.) 768 to 874, l. c. 857-858. This court in two early cases mentions that rule. [State v. Brown, 73 Mo. 631; State v. Jones, 54 Mo. 478.] In the Brown Case the prisoner, in the presence of officers, was told that it would be better for him

to tell the truth, and was promised a definite arrangement not to prosecute him. The influence thus exerted was presumed to be with him when a subsequent confession was made.

In the Jones Case, 54 Mo. l. c. 479-480, this court said: "It is true that on the preceding day the prisoner has been brutally treated; but that had been done by a different party, and it is not shown that any of them were present exerting any influence when the confession to Hickox was made."

The court then cites Wharton on Criminal Law and other authorities to the effect that the subsequent confession is supposed to be due to the same motives that induced the original confession obtained improperly, and commented thus: "The cases above cited show that in each instance the prisoners were intimated, and under the influence of threats made the confession before the magistrate when they were being examined, and the subsequent confessions were made before the same magistrates upon the basis of the first ones." The court then held the subsequent confession admissible because the original inducement was not present.

It is held in the cases cited in the note to the case of Ammon v. State, supra, that the presumption that the subsequent confession is due to the original improper influence is not conclusive. It depends upon the circumstances under which the original confession was obtained and its relation to the subsequent one. [18 L. R. A. (N. S.) 858.]

If no connection appears between the threats or promises and the confession offered in evidence it will not be excluded. [State v. Hopkirk, 84 Mo. l. c. 284-5.] In the case of State v. Patterson, supra, the defendant while under arrest in Sedalia was being guarded in the mayor's office. There were threats of a mob, and when someone climbed upon the roof and looked through the skylight persons guarding the defendant said they would shoot. The prisoner afterwards described his sensations by saying: "Boys, my hair stood on end. If it

had not been for you [meaning his guards] they would have mobbed me." [73 Mo. l. c. 703.]   The next day while the prisoner was being conducted on horseback to the place of trial he confessed.   The court said in relation to that confession, l. c. 707, quoting from an Alabama case in which a confession was held admissible notwithstanding that on the day before while confined the prisoner actually was threatened with violence by a third person, and added:   "Here the visit at night by third persons to the mayor's office may have resulted from a mere idle or impertinent curiosity.   At any rate, we are not disposed to regard any apprehension which may have arisen to the prisoner's mind as still remaining at the time he confessed."

It depends entirely upon the nature of the influence exerted.   True, the present case is different from those just considered in that the *same* officer whose menacing attitude induced the first confession had the prisoner in custody when the second was received.   While that fact must be considered, it is not conclusive, and if the original influence could not have continued so as to cause the second confession, the presumption just mentioned vanishes.

Among other things, authorities say the age, character and experience of the accused are to be considered in determining whether the confession is voluntary.   It cannot be said that the defendant in this case was weak in character.   If the evidence for the State is correct he had the hardihood to attempt the robbery of a bank in broad daylight, had the presence of mind under fire to assist a wounded comrade into an automobile and get away;   he exercised some ingenuity in concealing his whereabouts and his connection with the crime.   He was not a person to lose his head and fail properly to estimate the situation which confronted him when he was arrested, although it was in the night and he had been wounded.   The question is whether the fear which caused his exclamatory statement that he was there remained with him and induced him to make the confession four or five

hours later at headquarters. What influenced him, when the officer covered him, to exclaim, "Don't kill me, I was there?" Evidently he was afraid of being shot; not a general fear of being shot at any other time, but fear of being shot at that instant by the weapon in the officer's hands. It could not be denied for an instant that, as soon as he yielded to arrest and the officer put up his weapon the danger ended. Four or five hours later at the police station there was no reason whatever to apprehend injury. He had sufficient capacity for reasoning and sufficient presence of mind to understand that there was no possibility whatever of the officer using his weapon or of any personal violence at the time the confession was obtained. If at the time of his arrest he had been promised immunity or mitigation, or had been threatened with severe punishment in case he did not confess, and under the influence of such promise or threat he had made the first statement, it could plausibly be said that such influence remained with him at the time the written confession was made because of the peculiar continuing character of the inducement. But here, whatever caused him to say "I was there" it was not the promise of immunity in his trial, nor fear of anything except that which would affect him only at that particular moment.

Another distinction from the other cases: The weapon was not leveled at the defendant to induce him to confess, but to compel surrender. He did not have to confess in order to escape being shot; he had only to give up. As a man of nerve and presence of mind he knew that a surrender was all the officer demanded. In the excitement of the moment he exclaimed his guilt; he might have thought it prudent to do so. He was bound to know that as soon as he yielded and was safely in custody no danger of violence remained. It is absurd to say that later, when he confessed, he did so because he still was afraid of Phelan's weapon. The entire situation, the character of the influence exerted, and the purpose for which it was exerted, affirmatively show that

no such influence could have remained. It would have been proper for the court in the absence of the jury to have taken evidence to determine whether the statement was voluntary, but the defendant did not request it and no complaint is made of the court's failure to do so.

The defendant was hardly harmed by the admission of the statement, because before it was offered in evidence Mr. McNellis had testified that he was at the police station, apparently some time after the arrest, and heard the defendant state all the essential facts contained in the written statement; how he met the other men the day before the attempted hold-up, learned their unlawful purpose and by prearrangement met them the morning of the attempt and went with them to the bank, which he did not enter, but was shot just outside of it. It coincides exactly with what is contained in the written statement, except some of the details as to how they approached the bank and how they got away. By clear inference it involved the defendant's escape with the others in the automobile.

The statement sworn to by McNellis went in without any objection, except as to form—that the witness was stating conclusions instead of the language of the prisoner—which parts of his evidence were stricken out. In addition to that, two or three days after the shooting—about Friday, the attempted robbery having occurred Tuesday—several witnesses heard defendant say at the police station that he did not deny being connected with the hold-up. This latter evidence was objected to on the ground that the prisoner was under duress at the time. The only duress mentioned was that supposed to be exercised when he made the written statement, or at the time of his arrest. Such alleged duress could not have continued up to the time of this statement, and that evidence was clearly competent. So, that every essential fact contained in the written statement was before the jury by other and competent evidence.

III.  Error is assigned to the ruling of the court in allowing leading questions to be asked by the State's attorney in examining the State's witnesses and in assuming certain facts in such questions.  There
**Leading Questions.** is no doubt that some of those questions as they appear in the record were improper, and the court should not have allowed them to be answered, but a careful examination of the record does not show that any facts were elicited by such questions which were not fully developed by other and competent testimony; the errors, therefore, were harmless.

The same may be said of certain questions which asked for hearsay statements.  They did not elicit any information which was harmful to the defendant.

Officer Phelan when describing his approach to the house where defendant was arrested, used the expression, "I saw a house with one light, which looked suspicious." The defendant objected to the statement, because it was
**Conclusion.** a conclusion and moved that it be stricken out. The court overruled the motion and exception was duly saved.  It is impossible to see in what manner the defendant was harmed by that conclusion of the officer; the use of the word "suspicious" did not indicate that he suspected the inmates of the house of crime.  It was eleven o'clock at night, when everything was dark, and there was one house with a light in it.  The officer probably had a "hunch" that the persons looked for were there and that is the most that can be said of it. The effect of the statement was not as injurious to the defendant as the actual facts surrounding his arrest in that very house.

IV.  The appellant claims error was committed by the court in allowing a prosecuting attorney to make
**Argument to Jury.** certain remarks in his address to the jury. Several passages from the prosecutor's argument are quoted in support of the contention.
(a)  In his address Mr. Moore, prosecuting attorney,

referring to the defendant, said that "Chief Phelan went out and located this man at Burke's place on East Fourteenth Street, a notorious joint." Defendant's counsel objected to that statement, and the court ordered it stricken out. Counsel for defendant then asked the court to reprimand the prosecutor. The court then instructed the jury not to consider the remark in arriving at the verdict, and ordered the prosecutor to keep within the record. Defendant's counsel objected to the failure of the court to administer a reprimand to the prosecutor, and moved the court to discharge the jury, which motion was overruled.

A reprimand by the trial court in such case should be for the purpose of counteracting the prejudicial effects of objectionable remarks. It is likely to be injurious to the party reprimanded, and should not be such as to go further than that, nor to give advantage to the side objecting. The court in this instance, by peremptorily ordering the prosecutor to keep within the record and directing the objectionable remarks to be stricken out, doubtless thought the reprimand was sufficient to neutralize the bad effects of the remarks. We are not prepared to say that the court incorrectly determined that question. The incident was not sufficient to require a discharge of the jury, a matter largely within the discretion of a trial court. [See State v. Bersch, 276 Mo. 397, l. c. 424.]

(b) The prosecutor then described the incident where Chief Phelan went to the house where the defendant was found and mentioned the "companion" of defendant. On the objection of the defendant, Mr. Moore proceeded: "He was there with defendant. I do not know whether he was a friend, his companion or an associate, but he was there with him. And what did he attempt to do? He attempted to shoot down Officer Phelan." This was objected to, objection overruled, and appellant assigns error.

It is not proper for a prosecutor in his argument to tell the jury that he believe the defendant guilty, or

state his belief in any other essential fact prejudicial to the defendant, because it might be inferred by the jury that the statement of his belief was based upon information obtained outside of the competent evidence. But where the prosecutor refers to the evidence and draws a conclusion, though it be unsound, from the facts in evidence, it is not error to permit it. [State v. Reppley, 213 S. W. 477, l. c. 480, and cases cited; State v. Seay, 222 S. W. l. c. 429.]

Here it is plain that the remarks of the prosecutor were conclusions drawn from the evidence. The evidence did show that when Phelan broke his way into the room the defendant and the other man were there; the other man reached for his gun, which was lying on the dresser, and was knocked down by the officer. When the prosecutor said he didn't know whether the other man was a companion, or his friend, or an associate, he was inferring such relation from the fact that ''he was there with him.''

(c)    Moore proceeded with his argument: ''You [meaning the court] have not jacked me up a single time, and he has made twenty objections already; if I had done anything improper you know your Honor would have done it.''

This remark was objected to and the court ordered it stricken out, but declined to reprimand the prosecutor at the request of defendant's counsel. It appears from this remark that the prosecutor has been aggravated by repeated interruptions and objections to his remarks as he proceeded, and usually he had been sustained by the court. It was hardly a proper remark for the prosecutor to make in a moment of irritation, but the trial court understood the circumstances which called it forth and we are not prepared to say that a reprimand was required.

(d)    Mr. Curtin, assistant prosecuting-attorney, in his closing remarks in describing the incident of the arrest of the defendant where the Chief knocked down the other man who was with defendant in the room, evidently referring to the argument of the defense, said:

292 Mo.—7

"Why, you would think Chief Phelan should have gone out with an olive branch. . . .

"I tell you the police when they undertake to apprehend these men, take their lives in their hands, and I say that brave officer who sat on the stand yesterday took his life in his hands when he went to serve you people. When he struck that man he was grabbing for that gun. I don't think Phelan did what I would have done. I would have done worse than that. I would not have put my life against a man of that character. I would have killed him then. They have no right to live. They forfeit all their rights to live when they go about in the community committing that kind of a crime."

And after an interruption he proceeded:

"I say that the police department can't handle this class of men like they might handle some other men. They can't handle them with gloves. Whenever they do that they take their lives in their own hands, and Phelan handled them the only prudent way he dare handle them and be in the court room today."

The objection to these remarks was overruled, and the appellant predicates error upon that ruling.

The prosecutor evidently was replying to an argument which had been made by the appellant's counsel in which he had contended that the method of conducting that arrest was too harsh. The Chief undoubtedly did take his life in his hands. He was seeking men who had attempted to rob a bank and had killed the cashier; dangerous and desparate characters undoubtedly. The inference that he was taking his life in his hands was entirely warranted. When the prosecutor went further and told the jury what he would have done, that he would not have taken as much chance as the Chief took, that he would have used more violent methods, it was plainly an inference from what the necessities of the circumstances required. It will be noted, too, that the violent act which he justified in that argument was the knocking down of the other man, not the defendant; it was the supposed associate of the defendant who in fact was mak-

ing a move to seize his own weapon, and the inference as to the violent character of that man, as a justification of the rough treatment of the officer, and the rougher treatment the attorney would have administered, is drawn from the evidence. Whether the inference of his violence was entirely warranted it was unnecessary to consider; it is sufficient that it was drawn from the evidence.

(e)  In closing his argument Mr. Curtin delivered this admonition: "Gentlemen of the Jury, this case is going to pass to you twelve men now. Now you jurors may send out a warning or encouragement, whichever you may see fit. If there is any man on this jury that will stand for this sort of thing then I am disappointed in my fellow men." Objection to that remark was overruled and exception noted.

Where the record is such as is presented in this case, it is not improper for the prosecutor to refer to the prevalence of crime in the community, whether it appears from the evidence or is a matter of common knowledge, and with that in view to urge the jury to do their duty, and to argue that it would be a reflection upon them to fail to convict under the evidence before them. [State v. McBride, 231 S. W. l. c. 594; State v. Sherman, 264 Mo. l. c. 385; State v. Rogers, 253 Mo. 399, l. c. 415; State v. Zumbunson, 86 Mo. l. c. 113; State v. Rasco, 239 Mo. l. c. 581.]

V.  The appellant complains of the refusal of the court to give several instructions asked by him to the effect that there was no evidence that the defendant shot and killed the deceased or that he had, prior to the shooting, entered into an agreement or conspiracy to rob the officials of the bank, or that he was assisting, aiding or abetting one C. B. Johnson. It is true there was no direct evidence that the defendant shot the deceased, or that there was a definite conspiracy with which he was connected to rob the bank, but there are circumstances from which the jury might draw that inference. He did know the day before of the pro-

Conspiracy.

jected plan to rob the bank and joined the other robbers on that morning, evidently for the purpose of carrying out that intention. It is not necessary to prove all the terms of a conspiracy in order to show such an agreement; it need not be expressed, it may be shown by circumstances. [Allen v. Forsythe, 160 Mo. App. 269; State v. Shout, 263 Mo. 1. c. 373; State v. Bersch, 276 Mo. 1. c. 414.]

There was evidence tending to show that the defendant was one of the robbers who entered the bank when the shooting began immediately in which all the robbers, apparently, engaged. Besides it made no difference whether the defendant actually fired the shot which killed Shockey or not. He was guilty if he was concerned with the others in the attempted robbery.

VI. Likewise the court did not err in refusing to instruct on murder in the second degree, or manslaughter, because there was no evidence whatever up-on which to base such instructions. The fact that murder was committed in the attempt to commit a felony is the legal equivalent of premeditation and deliberation constituting murder in the first degree. [State v. Carroll, 232 S. W. 1. c. 702; State v. Garrett, 276 Mo. 1. c. 312, and cases cited.] The defendant's connection with the crime was through his association with the other men in the attempt to rob the bank, in which attempt the murder was committed. It was murder in the first degree if he was there with the others engaged in that enterprise.

*Instructions: Murder in Second Degree.*

VII. Likewise the court did not err in refusing to instruct on circumstantial evidence, because there was direct and positive evidence of eye witnesses to the crime. [State v. Stegner, 276 Mo. 1. c. 440.]

The appellant also assigns error to the failure of the court to instruct on self-defense on the theory that the deceased fired the first shot. The only evidence upon the subject is to the

*Circumstantial Evidence.*

effect that the men came into the bank with their guns in their hands. There was no ground for self-defense.

VIII. Appellant claims the court erred in the instructions given on behalf of the State. These instructions fully and correctly declare the law of murder, under the facts as shown in the evidence, and required a finding of all the facts necessary to constitute murder in the first degree. It is claimed that the court did not define homicide. The court did define murder in the first degree. That was the crime charged and the only definition necessary.

The court did not define robbery, nor was it necessary; that was a collateral issue in the case and no instruction in relation to it was necessary unless the defendant had requested such instruction. No such request was made. [State v. Miller, 292 Mo. 124; State v. Kolafa, 291 Mo. 340; State v. Starr, 244 Mo. 161, l. c. 181, 183; State v. Harris, 232 Mo. l. c. 321; State v. Webb, 205 S. W. l. c. 190.]

The case was well tried and the court allowed as much latitude to the defense as the circumstances required.

The judgment is affirmed. *Railey* and *Reeves, CC.,* concur.

PER CURIAM:—The foregoing opinion of WHITE, C., is adopted as the opinion of the court. All of the judges concur.