**STATE of Missouri, Respondent,**

v.

**Rayfield NEWLON, Appellant.**

**No. 61798.**

Supreme Court of Missouri,
En Banc.

Feb. 9, 1982.

Rehearing Denied March 9, 1982.

---

Lon Hocker, Richard H. Sindel, Clayton, for appellant.

John Ashcroft, Atty. Gen., Kristie Green, Asst. Atty. Gen., Jefferson City, for respondent.

RENDLEN, Judge.

Appellant stands convicted of capital murder, § 565.001, RSMo 1978, by a jury which, in the punishment phase of trial, § 565.006, RSMo 1978, fixed the penalty at death, § 565.008, RSMo 1978, and judgment was rendered accordingly. Direct appeal to this Court lies in such cases for consideration of the punishment assessed, § 565.014, RSMo 1978, as well as the several claims of error. Art. V, § 3, Mo.Const.

For his assignments of error appellant asserts: (1) facial invalidity of the death penalty; (2) improper excuse for cause of three veniremen expressing an unwillingness to consider imposition of the death penalty; (3) prejudice in the verdict directing instruction which failed to require a finding of the mental state necessary for capital murder; (4) failure of the trial court to *sua sponte* control prosecutorial comment; (5) improper limitation of impeachment of a State's witness; and (6) impermissible vagueness and misapplication of § 565.012.2(7), RSMo 1978, on which the punishment was predicated, rendering the sentence a nullity.

From the substantial evidence adduced supportive of the verdict the jury could reasonably have found the following: On

April 24, 1978, at approximately 10:20 p. m., Mr. Mansfield Dave sent his wife and son home from the "Quick Shop" "convenience" store they operated as a family in Kinlock. About twenty minutes later, an alarm sounded alerting Mrs. Dave to possible trouble at the store and when she ran there, she found her husband on the floor dead or dying from two shotgun wounds in the upper body.

This steady flow of events that fateful April 24 led to Mansfield Dave's murder. Earlier in the day appellant brought a single shot 16 gauge shotgun to the home of Walter West, a friend of appellant for more than 10 years. At appellant's request, West brought him a hacksaw which they used to saw off portions of the barrel and the stock. The shotgun so shortened measured about 22 inches and could be concealed beneath a short jacket or inserted barrel first in the waistband of a man's trousers with a shirt or jacket over the stock. Leaving the home they walked along a back road to a liquor store, and on the way appellant, who had seven or eight shells in his pocket, test fired the gun into some weeds. During this time appellant suggested they rob Mr. Dave's "conveniency" store because he wanted "some money". Reaching the liquor store, appellant, who had concealed the gun in his heavy fur-trimmed jacket which extended to his mid-thigh, bought a six-pack of beer, and as they left, West flagged down a passing car driven by Franz Williams, another friend who had attended school with appellant through the seventh grade. The two men entered Williams' car, and when they told him of the robbery plan, Williams agreed to join the scheme. With Williams driving, the trio went to Mr. Dave's Quick Shop where West, apparently to size the situation, entered the store, bought a pack of cigarettes and returning to the car reported there were too many people present to carry out the robbery at that time. The men drove back to the liquor store and

purchased another six-pack of beer, then continued cruising the neighborhood in Williams' car.

At approximately 10:30 p. m., the three conspirators again drove to the victim's store and found the customers had gone. Only Mr. Dave remained. Williams and appellant then entered the store while West, who remained in the car, drove to a place in front of the building to permit a view of the store's interior. Williams went toward a soda case in the rear as appellant walked to the sales counter behind which Mr. Dave was standing. Above that counter, plexiglass panels formed a partial physical, though not a visual, screen for the back counter area. Appellant, stationed himself at a point where an opening occurred in the screen and there confronted Mr. Dave who after a moment's conversation, turned his back apparently to get cigarettes from a rack. It was then that appellant drew the sawed-off shotgun concealed in his clothing and aimed at his victim. As Mr. Dave turned back toward the counter, appellant with a blast from the shotgun knocked him to the floor. Appellant then deliberately broke open the single action gun, extracted the spent shell, reloaded[1] and peering over the counter with Williams, who had by then come to the front of the store, once more hand cocked the gun, took aim and again shot Mr. Dave. He again broke open the gun, extracted the second spent shell and followed Williams from the store. Once outside the two ran in different directions but were shortly picked up by West in the car and as appellant reentered the car he stated that he had to "burn" (kill) Mr. Dave. Though the robbery plan failed, as no money was taken from the store, the murder succeeded when Mr. Dave died from the wounds, one in the upper left chest and the other in the upper left shoulder.

After Mrs. Dave heard the alarm[2] and was running to the store, she saw Williams

---

1. These activities were described in a general way by witness West. The details of the gun, its mechanism and the operation of loading, hand cocking and extracting the shells were determined from a full examination of the exhibits.

2. The alarm which brought Mrs. Dave to the store was heard by West shortly after the

and noted he was not carrying an object of any kind, which is corroborative of the testimony that appellant (not Williams) had the gun and did the killing. The police were promptly summoned to the scene and in their investigation found two spent 16 gauge shotgun shells and, sitting on the counter, a cold bottle of Nehi orange soda bearing William's fingerprints. This too corroborates the testimony that Williams had gone to the rear of the store to get the soft drink from the case while appellant confronted and shot Mr. Dave at the counter near the front. The night after the homicide, appellant delivered the shotgun to West's home where West applied some tape on the shortened stock which had loosened, and later asked his cousin, Kevin Hughes, to take the gun from the house. Hughes did so, but apparently apprehensive of the situation, delivered the gun to Chief Patton of the Kinlock Police and was paid $24. Defense counsel characterized Hughes to the jury as the "little snitch."

The police in their later investigation found the sawed-off portions of the barrel and stock at West's house and determined the shotgun was the weapon which had fired the two spent cartridges found at the murder scene.

Appellant was at the time of the murder a 23 year old black man, with an 11th grade education. He had four convictions of burglary second degree, three convictions of stealing and one conviction of larceny. Though, the record is unclear how much total time was imposed his sentences totaled at least 12 years and perhaps more. Appellant had served part of this time in the penitentiary. In an initial statement to the police, he admitted his presence at the scene but contended he had stayed in the car while West and Williams went inside the store. He later made a videotaped statement and changed his story, admitting that Williams and *indeed he* had entered the store but asserted that Williams did the shooting while he, appellant, went to the soda case at the rear of the store. In this videotaped statement he also admitted he knew the purpose of their entering the store was to carry out a "heist" (robbery) and in this statement he also asserted that Franz Williams while standing near the car before entering the store stated that "I [Franz Williams] might have to shoot him [Mr. Dave] because he knows me". Thus the possibility of killing Mr. Dave to eliminate any witness was implicitly a part of the plan. In this connection it is important to note that appellant knew the "place", that he had been in the store on prior occasions and was familiar with the store and some of the people who worked there. He knew the store was close by and that the men could "walk" to it. Easy accessibility appears to have been a consideration in choosing that store to rob, all of which suggests that destroying the witness was a motive for the killing. At trial, again changing his story, appellant stated he was not present at the scene of the crime.

### I.

Appellant contends that the death penalty authorized by § 565.008, RSMo 1978, is unconstitutional under the United States and Missouri Constitutions. When considering such "statutory validity" challenges we are mindful that our legislature's enactments generally enjoy a presumption of constitutionality and will be declared void only when manifestly infringing a constitutional provision. *State v. Hamey*, 168 Mo. 167, 67 S.W. 620, 628 (Mo. banc 1902). *See also, State v. Mitchell*, 563 S.W.2d 18, 26 (Mo. banc 1978). In any determination as to constitutionality of legislatively prescribed punishment, validity is presumed and those seeking invalidation are heavily

---

second shotgun blast. Though counsel suggests on appeal that Mr. Dave's conduct (which included activating the alarm) might have caused the shooting, appellant in his statements to the police, made no mention of the alarm, and in his trial testimony, claimed he was not present at the scene, belying counsel's argument. When Mrs. Dave reached her husband after the shooting, he was prone behind the counter with a gun (apparently a pistol) partially exposed in his pocket. Nothing in the record, however, supplies a possible nexus to the killing.

burdened to demonstrate it as barberous or excessive. *State v. Higgins*, 592 S.W.2d 151, 155 (Mo. banc 1979), *app. dismissed*, 446 U.S. 902, 100 S.Ct. 1825, 64 L.Ed.2d 254 (1980). Attentive to these principles we examine appellant's contentions. First: that the death penalty violates the cruel and unusual punishment clause of the Eighth Amendment and the due process provision of the Fourteenth Amendment. This assertion runs contrary to the decisions of the United States Supreme Court in *Gregg v. Georgia*, 428 U.S. 153, 169, 96 S.Ct. 2909, 2923, 49 L.Ed.2d 859, 872 (1976); *Proffitt v. Florida*, 428 U.S. 242, 247, 96 S.Ct. 2960, 2964, 49 L.Ed.2d 913 (1976); *Jurek v. Texas*, 428 U.S. 262, 268, 96 S.Ct. 2950, 2954, 49 L.Ed.2d 929 (1976). The Court in *Gregg* reviewing the Georgia statutes' death sentence provisions found them constitutional. The analysis there is appropriate in this challenge to Missouri's statute which in essential part tracks that of Georgia leaving little doubt that our death sentence provisions, properly imposed, are sound under the Federal Constitution and we so hold.

■ Second: Appellant, without supporting authority, suggests the death penalty is violative of the cruel and unusual punishment provision of Art. I, § 21, and due process provision of Art. I, § 10, of the Missouri Constitution. We declared § 565.-008, RSMo 1978, valid against such attack under Art. I, § 21, in *State ex rel. Westfall v. Mason*, 594 S.W.2d 908, 916–17 (Mo. banc 1980), *vacated on other grounds, Bullington v. Missouri*, 451 U.S. 430, 101 S.Ct. 1852, 68 L.Ed.2d 270 (1981). In so deciding we refused to extend the reach of Art. I, § 21 as requested, and arrogate to ourselves a policy decision properly within the legislative province. Similarly we now refuse to stretch the meaning of Art. I, § 10 to invalidate the death penalty, beyond the limits of the due process requirements of the Fourteenth Amendment to the U.S. Constitution. More recently in *State v. Mercer*, 618 S.W.2d 1 (Mo. banc 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 432, 70 L.Ed.2d 240, this Court reviewed the application of Missouri's capital murder statutes and affirming the conviction and death sentence there imposed, necessarily accepted the facial constitutionality of the death penalty provisions.

■ Third: Appellant maintains that the death penalty is prohibited by the Missouri Constitution, Art. I, § 2, which provides:

*That all constitutional government is intended to promote the general welfare of the people; that all persons have a natural right to life, liberty, the pursuit of happiness and the enjoyment of the gains of their own industry*; that all persons are created equal and are entitled to equal rights and opportunity under the law; *that to give security to these things is the principal office of government, and that when government does not confer this security, it fails in its chief design.* (Emphasis ours).

This novel proposal requires a strained construction of that section contrary to its obvious intendment. Without question the State of Missouri is not prohibited by this section from imposing the death penalty on depraved murderers. Instead the State is charged with conferring "security" for the "life" and "happiness" of its citizens generally. Such is the thrust of the section and if "government" fails in these things (e.g. providing a deterrent to murder) and does not "confer this security, it fails in its chief design." Further, the strained construction here proposed flies in the face of the following related constitutional provisions by which the framers of our Constitution demonstratively intended the *death penalty could and would be imposed in appropriate cases.* Art. I, § 10: ". . . no person shall be deprived of *life*, liberty or property without due process of law." (Emphasis ours). Art. I, § 19: "That no person shall be compelled to testify against himself in a criminal cause, nor shall any person be put again in jeopardy of *life* or liberty for the same offense, after being once acquitted by a jury; . . ." (Emphasis ours). Art. I, § 20: ". . . all persons shall be bailable by sufficient sureties, except for *capital offenses*, when the proof is evident or the presumption great." (Emphasis ours).

In light of the clear intent of Missouri's Constitution and the extraordinary increase of murder, accompanied all too frequently by incidents of cold brutality exceeding the pale of a civilized people, we hold that § 565.008, RSMo 1978, violates neither Sections 2, 10 or 21 of Art. I of the Missouri Constitution.

## II.

We turn now to appellant's contention that the trial court committed plain error by its Instruction No. 9. This allegation of error was not raised by objection at trial nor preserved for review in appellant's motion for new trial. It is raised for the first time in appellant's brief and will be reviewed for plain error under Rule 29.12. In submitting the issue of appellant's guilt of capital murder as an accessory, the trial court gave, among others, the following instructions:

### INSTRUCTION NO. 5—MAI–CR 2.10

All persons are guilty who knowingly act together with the common purpose of committing an offense, or who knowingly and intentionally aid or encourage another in committing it, and whatever one does in furtherance of the offense is the act of each of them.

The presence of a person at or near the scene of an offense at the time it was committed is alone not sufficient to make him responsible therefor, although his presence may be considered together with all of the evidence in determining his guilt or innocence.

### INSTRUCTION NO. 8—MAI–CR2d 2.14

In this case you will be instructed that you may find the defendant either not guilty of any offense or guilty of either capital murder, murder in the first degree, murder in the second degree or manslaughter. In that connection you are instructed that when two or more persons are criminally responsible for an offense which is divided into degrees, each such person is guilty of that degree which is compatible with that state of mind with which he acted in committing the offense and compatible with his own accountability for any aggravating or mitigating fact or circumstance.

### INSTRUCTION NO. 9—MAI–CR2d 15.02, MODIFIED BY MAI–CR 2.12

If you find and believe from the evidence beyond a reasonable doubt:

First, that on or about April 24, 1978, in the County of St. Louis, State of Missouri, the defendant or another caused the death of Mansfield Dave by shooting him, and

Second, that the defendant or another intended to take the life of Mansfield Dave, and

Third, that the defendant or another knew that they were practically certain to cause the death of Mansfield Dave, and

Fourth, that the defendant or another considered taking the life of Mansfield Dave and reflected upon this matter coolly and fully before doing so, and

Fifth, that the defendant acted either alone or knowingly and with common purpose together with another in the conduct referred to in the above paragraphs, then you will find the defendant guilty of capital murder.

However, if you do not find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.

■ Appellant charges plain error in the form of Instruction No. 9. The murder occurred April 24, 1978, and at that time the statute in effect was § 565.001, RSMo 1978, proscribing certain acts as capital murder. In connection with the capital murder statute instruction MAI–CR2d 15.02 was promulgated for trials of homicides occurring after May 25, 1977. Also in effect at the time of the murder was § 556.170, RSMo 1969, delineating responsibilities of accessories to murder and prescribing the punishment for their conduct. MAI–CR 2.12 was promulgated as its accompanying instruction. In sum, these statutes and

their corollary instructions were those in vogue for crimes committed on April 24, 1978, the time of the murder. *See, State v. Lute*, 608 S.W.2d 381, 383 (Mo. banc 1980). This Court in *Lute*, citing *State ex rel. Peach v. Bloom*, 576 S.W.2d 744, 747 (Mo. banc 1979), stated, "... the 'provisions of law existing prior to the new criminal code [are] applicable to all offenses committed prior to January 1, 1979.'" Here the trial court, consistent with the *Lute* rule applied the statutes and employed the instructions prescribed for use in criminal cases effective at the time of the murder. Appellant, however, complains that because the trial occurred after January 1, 1979, the effective date of the new Criminal Code, the new accessory statute, § 562.041 and the corresponding approved instruction for that section, i.e., MAI–CR2d 2.12, should have been submitted. This contention is not well taken and it would have been error to have done as appellant now urges. *See, State v. Lute, supra.*

■ Appellant contends Instruction No. 9 fails to apprise the jury of the elements of capital murder found in § 565.001, RSMo 1978. That section defines capital murder as "Any person who unlawfully, willfully, knowingly, deliberately, and with premeditation kills or causes the killing of another human being is guilty of the offense of capital murder." While Instruction No. 9 [MAI–CR2d 15.02, MAI–CR 2.12] does not utilize the precise statutory words, it nevertheless employs terms which have been determined as proper substitutes by our courts. Indeed the terms utilized in Instruction No. 9 are preferable for instructional purposes in that they more clearly set forth the mental state and other aspects of the crime necessary for conviction of capital murder. In particular, appellant complains the term "unlawfully" is not employed in Instruction No. 9. This contention misses the point and is without merit. The question of whether the homicide is lawful or unlawful is in the first instance a question of law to be decided by the court at the close of the evidence when determining whether a submissible case has been made. At that point there was not a scintilla of

evidence suggesting the killing was "lawful" or justifiable [which would have required modifying 15.02 (No. 9) by one of the forms set forth at 2.40 et seq.] or excusable [which would have required modifying 15.02 by 2.28]. Hence, there is no requirement that the term "unlawfully" or an equivalent be employed in this instance.

The statutory elements "willfully" and "knowingly" are adequately reflected in the second and third paragraphs of Instruction No. 9 which require a finding that defendant intended to take the life and knew he was practically certain to cause death. *State v. Thomas*, 595 S.W.2d 325, 328 (Mo. App.1980).

The element "deliberately" is appropriately set forth in the fourth paragraph of Instruction No. 9 which mandates that defendant coolly and fully reflected on this act. *See, State v. Turner*, 623 S.W.2d 4, 7 (Mo. banc 1981); *State v. Strickland*, 609 S.W.2d 392, 394 (Mo. banc 1980). The element of premeditation is defined in Missouri as thought beforehand for any length of time however short. *State v. Turner, supra* at 7. The equivalent term "considered" in No. 9 supplies the requirement of premeditation prescribed in the statute. Accordingly we hold that Instruction No. 9 correctly requires the finding of the statutory elements of capital murder.

■ Appellant next contends the instructions given were fatally defective in that they did not require a finding of premeditation *in appellant*, and complains of the phrase "defendant or another" used in each paragraph in Instruction No. 9. This phrase is specifically provided by Instruction MAI–CR 2.12 and Notes on Use when there is evidence of accessory liability, and the mode of melding 2.12 in the structure of 15.02, utilized here, is in the form prescribed. An instruction thus in the format of MAI–CR will not be deemed error. *State v. Easton*, 577 S.W.2d 953, 958 (Mo. App.1979), *cert. denied*, 444 U.S. 863, 100 S.Ct. 131, 62 L.Ed.2d 85; *State v. Champion*, 560 S.W.2d 903, 905–06 (Mo.App.1978). Further, according to Missouri law, premed-

itation may be found in another and imputed to defendant as contemplated by the language of Instruction No. 9. That language when read with the general Instructions No. 5 and No. 8, requires that appellant manifest the requisite intent for perpetration of the offense. It suffices if defendant "knowingly acted in concert with another for the common purpose of committing the offense, or knowingly and intentionally aided or encouraged the other in committing the offense." *State v. Turner*, 623 S.W.2d 4, 8 (Mo. banc 1981); *State v. Strickland*, 609 S.W.2d 392, 395 (Mo. banc 1980).[3]

■ Appellant next urges that for a conviction under § 565.001, RSMo 1978, the accused must be found to have premeditated, and the instructions fails in this regard. Missouri has abolished the distinctions between principals in the first degree and accessories. *State v. Lute*, 608 S.W.2d 381, 383–84 (Mo. banc 1980); *State v. Easton*, 577 S.W.2d 953, 957 (Mo.App.1979), *cert. denied*, 444 U.S. 863, 100 S.Ct. 131, 62 L.Ed.2d 85. Under § 556.170, RSMo 1969, effective at the time of the murder in question, one may be liable as principal by aiding and abetting another. MAI–CR 2.10 (Instruction No. 5) and 2.12 (Instruction No. 9) reflect this tenet by imposing guilt on one found to be an accessory to the same degree that guilt is imposed upon a principal.[4] Contrary to appellant's assertions, Instructions No. 9 and No. 5 did not permit the jury to find appellant guilty of capital murder solely on the basis that "another" possessed the necessary mental state for capital murder. These instructions correctly required that appellant be found (1) to have manifested the requisite intent and

did the killing or (2) that he knowingly and with a common purpose aided one who killed with the requisite intent for capital murder. *See, State v. Turner*, 623 S.W.2d 4, 8 (Mo. banc 1981); *State v. Grebe*, 461 S.W.2d 265 (Mo.1970).

Paragraph "Fifth" of Instruction No. 9 contains the essence of this proposition which is amplified and made abundantly clear by the provisions of the first paragraph of Instruction No. 5 and Instruction No. 8. We find no error, *a fortiori* no plain error, in the given instructions.

### III.

■ It is next asserted that in excusing three prospective jurors the trial court violated the standards of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). There it was held error to excuse veniremen voicing general objections to the death penalty. In its reiteration of the *Witherspoon* rule the Court in *Davis v. Georgia*, 429 U.S. 122, 123, 97 S.Ct. 399, 400, 50 L.Ed.2d 339, 341 (1976), stated: "Unless a venireman is 'irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings' . . . he cannot be excluded. . . ." Here the three excused fall into the class properly excluded. Venirewoman Daily was asked by the prosecutor: "[I]f after you were selected as a juror in this case, and you heard all of the evidence and deliberated and found the defendant guilty of capital murder. . . . [the concluding phrase was restated after objection by the defense] can you consider both sentences in arriving at your verdict—which are the death penalty and the life imprison-

---

**3.** Appellant attempts to bolster his contention by arguing the evidence showed no premeditation, hence, had the jury been instructed that premeditation personal to appellant was necessary, he would have been acquitted. This is an argument that the evidence was insufficient to sustain appellant's conviction, rather than a claim of instructional error. Further, we note the evidence, as set forth above, was sufficient to sustain appellant's capital murder conviction, whether he acted alone or as an accessory.

Appellant would also lend credence to his claims of instructional error by alleging that the prosecutor even argued to the jury that appellant need not personally have premeditated. Such allegation, however, is pertinent only to a contention of improper argument, not instructional error.

**4.** These instructions also virtually parallel current accessory liability statutes, § 562.041, RSMo 1978.

ment without parole for fifty years?" Mrs. Daily answered "no". Venirewoman Lang responded negatively to a very similar question propounded by the trial judge. Venirewoman Marshall was asked by the defense, in a question addressed to all the remaining venire persons, "[I]s there anyone that should Mr. Newlon be convicted of capital murder ... who couldn't consider, ... the penalty of imprisonment as well as the death penalty?" She replied, "I would not consider the death penalty." The response of each was unambiguous and unmistakably clear. The administration of justice requires jurors who will follow and not ignore the law. *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980); *State v. Mercer,* 618 S.W.2d 1, 6–7, (Mo. banc 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 432, 70 L.Ed.2d 240. Appellant's claim of error is without merit.

## IV.

Appellant would fault the trial court for what he contends is plain error[5] in failing to *sua sponte* declare a mistrial following remarks of the prosecutor in argument during the *punishment phase* of trial.[6] When measuring this contention several familiar principles bear reprise. Broad discretion rests with the trial court in the control of closing argument, with wide latitude accorded counsel in their summations. *State v. Wood,* 596 S.W.2d 394, 403 (Mo. banc 1980), *cert. denied,* 449 U.S. 876, 101 S.Ct. 221, 66 L.Ed.2d 98; *State v. Lansford,* 594 S.W.2d 617, 622 (Mo. banc 1980); *State v. Murphy,* 592 S.W.2d 727, 732–33 (Mo. banc 1979). A conviction will be reversed for improper argument only if it is established the complained of comments had a decisive effect on the jury's determination. *Murphy, id.* Indeed, relief should be rarely granted on assertions of *plain error* as to closing argument, for where no objection was lodged, trial strategy is an

important consideration and such assertions are generally denied without explication. *State v. Bryant,* 548 S.W.2d 209, 211 (Mo. App.1977). This because the absence of objection, request for admonishment to disregard, or for other relief narrows the trial court's options, requiring uninvited interference with summation and a corresponding increase of the risk of error by such intervention.

Nevertheless, appellant maintains the trial court abused its discretion by not voluntarily interrupting comments of the prosecutor's during argument, grouped here in three categories.

First, appellant alleges the prosecutor by these comments sought to enlarge the crime by appearing to have special knowledge outside the record.[7]

*Now, when I said initially, that this was a difficult thing for me—I've been a prosecutor for ten years and I've never asked a jury for a death penalty, but I can tell you in all candor, I've never seen a man who deserved it more than Rayfield Newlon.* By returning your verdict in this case,—and you people found him guilty of capital murder—that either means that you believe beyond a reasonable doubt that he pulled the trigger, or that he had the frame of mind that's consistent with pulling the trigger, and I submit to you, that Rayfield Newlon did pull the trigger, and didn't pull it once, but pulled it twice—executed an innocent man in cold blood.

So where do you go from there? *I say to you that I never saw a man who deserved it more and I say that to you in complete sincerity, and it's my job, as I see it, to tell you that.*

It is asserted these statements breach the rule that a prosecutor may not express an opinion implying awareness of facts not available to the jury. *State v.*

5. Review can be had only under the plain error rule because of appellant's want of objection to any of the contested remarks.

6. Appellant stood convicted of capital murder. No question of guilt remained. The jury was called then to consider matters in aggravation and mitigation. The record of his life, his prior

crimes, the heinous character of the murder as it bore on the issue of depravity were proper for consideration.

7. Italicized portions of the quoted arguments are the phrases to which appellant *now* objects.

*Moore,* 428 S.W.2d 563, 565 (Mo.1968); *State v. Hart,* 292 Mo. 74, 237 S.W. 473, 480–81 (1922). However, balanced against this rule is the proposition that the prosecutor may state his conclusion if it is fairly drawn from the evidence, and his inferences need not seem necessarily warranted. *State v. Jackson,* 499 S.W.2d 467, 471 (Mo. 1973); *State v. Jones,* 491 S.W.2d 271, 273 (Mo.1973); *State v. Moore, supra; State v. Hart, supra, State v. Haynes,* 528 S.W.2d 11, 13 (Mo.App.1975). Further, prosecutorial comment referring to facts not before the jury may be permissible, so long as it does not imply special knowledge of evidence pointing to defendant's guilt, *State v. Moore, supra; see, State v. McKinney,* 475 S.W.2d 51, 55 (Mo.1971); *State v. Coleman,* 524 S.W.2d 27, 33 (Mo.App.1975), and indeed the prosecutor may indicate a belief of guilt drawn directly from the State's evidence. *State v. Jackson, supra* at 471. Here the question of guilt had been settled. Only questions of aggravation and mitigation going to the issue of punishment remained. The jury had been confronted with substantial evidence pointing to the callous nature of the crime and depravity of the murderer. The record demonstrated a cold-blooded execution of an innocent man deserving of better, to avoid identification and/or for the pleasure of killing, linked with a total lack of remorse for the crime or sympathy for the victim. The statements of the prosecutor were directed to the allegation of depravity, a condition which could arguably be inferred from the evidence. A similar remark, "If ever I heard a better case made of burglary second . . .," was deemed permissible in *Haynes. Id.* at 13. We find no abuse of discretion by the trial court, and necessarily no manifest injustice in not *sua sponte* declaring a mistrial because of such statements.

The second group of comments now challenged, include the following:

*I submit to you that he deserves to die. He doesn't deserve to breathe the same air that Mrs. Dave breathes. She's a widow with a son, and he's a son with no father. He doesn't deserve to breathe the same air.*

. . . . .

Before you can take Rayfield Newlons' [sic] life, you have to give him a lawyer and a fair trial—he's entitled to that, and he got an excellent lawyer and a fair trial and twelve fair citizens. *Now, if you say he deserves the death penalty, under the law, Judge Ruddy must review it and if he agrees, then his decision is reviewed by the Supreme Court*—which is only appropriate and fair under the circumstances. But, did Mansfield Dave have his day in Court? If Rayfield Newlon is killed he'll know his appointed hour and have an opportunity to get his soul straightened out, and in a condition to meet his Maker. I'm not saying this lightly, or for dramatic effects—not at all. How do we know if *Mr. Dave was prepared to meet his Maker, or what condition his soul was in before he was blown away. Do you think he he gives a damn?* He didn't care . . . .

. . . . .

*I'm telling you, that Rayfield Newlon deserves to die, not only for what he did, but I think it's absolutely critical to say to him and others like him, . . . that you have got to stop killing.* You've got to stop robbing, and if you do this in St. Louis County you're going to pay the price. You people have got the opportunity here to send out this message, and to send it out all over St. Louis County— you're [sic] own community—and Kinlock is a part of your community—this could have happened in Ladue, Lemay, Florissant, or Ferguson—these kinds of crimes happen every day and go on happening, and you've got the opportunity to say that Rayfield Newlon's in this area, if you're going to do your killing and keep on doing it—don't do it in our community, because if you do, we're going to kill you because we got the right to do it; it's fair and appropriate and it's right—not cruel and not unusual punishment—it's right. Did Mr. Newlon show any remorse in the videotape? No. Did he show any remorse on the witness stand? No. Did

he show any reaction or emotion when the verdict was returned last night? You look at him? No. *He knew what was coming; he knew that what he did would send him to prison—that's no big deal—he's been there before, and what assurances do you have that he'll be there fifty years? The legislature could change the law. All it says is no parole. It doesn't say it can't be commuted. There's no assurance of that at all. The law could be changed, but at least with death there is some assurance he won't commit any more crimes and the message is loud and clear, and perhaps others will think twice before they commit a robbery and take a life just for money. What I'm saying to you is if you come back with a life sentence without him being eligible for parole for fifty years—that that won't get any reaction, and that's what he's expecting you to come back with—that's no big deal, going to prison, but maybe you'll get his attention if you come back with ... "we sentence you to death."*

. . . . .

*... the law gives you two alternatives. But, if somebody is guilty of capital murder the ultimate crime, why should they get anything other than death?*

. . . . .

*You know—when I talk about sending out a message—well, I know the Charles Mansons wouldn't hear the message, or the Richard Specks or the "sons of Sam" —those kinds of people wouldn't hear it because those people are insane—legally responsible for what they did, but they wouldn't get this kind of message, and in the same—a truer fashion, he's not insane.* This was simply a business venture—you know, he didn't hear any strange voices speaking to him, he just wanted some money, and all that stood between him and the money, was Mansfield Dave, and he eliminated—executed him.

. . . . .

*If Rayfield was going to harm your child, would you kill him? Would you have prevented this killing if you'd been in the Conveniency store with a gun, and you could have saved Mr. Dave's life? Would you have killed Rayfield? I think you would have—at least, I hope you would have had the courage to do either one of those. If you think you would have, kill him now. Kill him now. Once again, I hope you have the courage to do that, because it's tough.*

*I really don't have much more to say, but I hope to impress upon you that this is truly a war—I mean, a "street war" and it's justifiable to kill in a war. You know there are enemies—there's no question about it, Rayfield and others like him are the enemy and it's still going to go on, and on, and on, unless you citizens of St. Louis County say it's not going to go on, and we may have to catch you and convict you, but when we do, we're going to execute you, and at least those people won't go and do it.*

■■■■ Appellant maintains the court erred in failing to *sua sponte* prevent these remarks or to declare a mistrial because they improperly personalized the crime, causing the jury to fear appellant, applied personal epithets to appellant, and argued for the death penalty based on an anticipation of appellant's future conduct. The record however, warrants conclusions other than those urged by appellant. *See, State v. Hoskins,* 569 S.W.2d 235, 236 (Mo.App. 1978); *State v. Coleman,* 524 S.W.2d 27, 32 (Mo.App.1975). A review of the prosecutor's entire argument reveals a clear intent to impress upon the jury the serious nature of the murder as part of a permissible plea for strict law enforcement. We must not lose sight of the problem then before the court and jury. The prosecutor was seeking the death penalty which in his view was justified from the evidence and through analogy sought to demonstrate the aptness of the penalty as a deterrent. In this setting a prosecutor may urge imposition of a severe sentence as a signal to deter future crimes in a community. *State v. Wright,* 515 S.W.2d 421, 432 (Mo. banc 1974); *State v. Laster,* 365 Mo. 1076, 293 S.W.2d 300, 306 (Mo. banc 1956), *cert. denied,* 352 U.S. 936,

77 S.Ct. 237, 1 L.Ed.2d 167; *State v. Cole*, 588 S.W.2d 94, 100 (Mo.App.1979); *State v. Bryant*, 548 S.W.2d 209, 212 (Mo.App.1977). Further, under evidence in this record it was not improper for the prosecutor to refer to the prevalence of crime as a "street war" as it appears from the evidence or as a matter of common knowledge, *State v. Hart*, 292 Mo. 74, 237 S.W. 473, 481 (Mo. 1922), and to argue that it would be a reflection upon them to fail to convict under the evidence presented. The prosecutor's reference to the victim's family was a legitimate comparison of defendant to the victim, demonstrative of the inutile nature of the slaying and that the senseless cruelty of this act revealed a depravity justifying the death penalty as a deterrent to such acts. *See, State v. Jackson*, 499 S.W.2d 467, 471 (Mo.1973); *State v. Swenson*, 551 S.W.2d 917, 920 (Mo.App.1977). Appellant's assertion that the prosecutor categorized him with certain notorious killers misconstrues the argument in this regard. *See, State v. Hoskins*, 569 S.W.2d 235, 236 (Mo. App.1978); *State v. Coleman*, 524 S.W.2d 27, 32 (Mo.App.1975). Taking the remark in context, it appears the prosecutor was urging that imposition of the death penalty in a case such as this would serve as a better deterrent than it would to one of the insane mass murderers mentioned. The other remarks argued as having impermissibly personalized the crime, or caused the jury to fear appellant and urged death to prevent future crime by appellant, were coupled with comments generalizing the deterrent effect to others of a strict sentence in this case. The thrust of the contested statements was a plea for stricter law enforcement as a deterrent to crime. *State v. Swenson*, 551 S.W.2d 917, 920 (Mo.App. 1977). It has long been recognized that the prosecutor is permitted to argue such propositions as the prevalence of crime in the community, the personal safety of its inhabitants, and the jury's duty to uphold the law as well as inferences from its failure to convict, and such pleas may call upon common experience. *State v. Rodriguez*, 484 S.W.2d 203, 207 (Mo.1972); *State v. Jackson*, 477 S.W.2d 47, 53 (Mo.1972); *State v.*

*McKinney*, 475 S.W.2d 51, 55 (Mo.1971); *State v. Burnett*, 429 S.W.2d 239, 246 (Mo. 1968); and *State v. Brauch*, 529 S.W.2d 926, 931 (Mo.App.1975).

■ Appellant's final challenge centers on the following comment:

Did Mr. Newlon show any remorse in the videotape? No. Did he show any remorse on the witness stand? No. Did he show any reaction or emotion when the verdict was returned last night? You look at him? No. *He knew what was coming; he knew that what he did would send him to prison—that's no big deal— he's been there before, and what assurances do you have that he'll be there fifty years? The legislature could change the law. All it says is no parole. It doesn't say it can't be commuted. There's no assurance of that at all. The law could be changed, but at least with death there is some assurance he won't commit any more crimes and the message is loud and clear, and perhaps others will think twice before they commit a robbery and take a life just for money. What I'm saying to you is if you come back with a life sentence without him being eligible for parole for fifty years—that that won't get any reaction, and that's what he's expecting you to come back with—that's no big deal, going to prison, but maybe you'll get his attention if you come back with . . . "we sentence you to death."*

He relies on *State v. Mobley*, 369 S.W.2d 576, 580–81 (Mo.1963), for the proposition that the State may not argue a defendant's criminal record as a reflection of his character and a basis for conviction, nor to prevent future criminal acts by him. *Mobley*, however, is inapposite. The argument there was in a unitary proceeding for determination of guilt on a burglary charge. Here testimony of appellant's prior criminal convictions had entered the case as impeaching evidence during his testimony in the guilt phase. Such evidence was available for consideration during the presentence (punishment phase) hearing (§ 565.006.2) and was relevant to the issue of depravity, revealing in part appellant's background to better assess the crime, the

then convicted criminal and the appropriate punishment. It was a permissible subject for argument. The contention is denied.[8]

## V.

 It is next contended that the trial court erred in refusing to allow testimony of a defense witness to impeach William West's reputation. A single question was posed to defense witness Parker: "Does he [West] have a reputation in Kinlock for truth and veracity?" Objection was sustained and no offer of proof nor further inquiry followed. This allegation of error, not included in appellant's motion for new trial, will be examined for plain error under Rule 29.12. While testimonial evidence may be introduced to impeach a witness's reputation for truth and veracity in the community, *State v. Woods*, 428 S.W.2d 521, 523 (Mo.1968); *State v. Cross*, 343 S.W.2d 20, 23 (Mo.1961), the trial court has wide discretion as to the admission of such evidence. *State v. Miles*, 253 Mo. 427, 161 S.W. 766, 769 (Mo.1913). West's credibility had been repeatedly attacked throughout cross-examination during which prior felony convictions, as well as the voluminous record of his prior inconsistent statements, were brought to the jury's attention. West admitted and it was stipulated he had been convicted of burglary second degree and stealing, as well as flourishing (a deadly weapon), for which he received concurrent three year sentences. These sentences were imposed only two days before he had been allowed to plead guilty to murder in the second degree for his part in the Mansfield Dave killing. Though he had not been sentenced, the State had agreed to recommend ten years. This told the jury West had been convicted of crimes involving dishonesty (burglary and stealing) and crimes of violence (the murder of Mr. Dave), and had a profound interest (the plea bargain for second degree murder) motivating his testimony favorable to the State. Evidence of this "deal" in return for his testimony was before the jury. Clearly, additional evidence as to his general reputation could have been of marginal value as impeachment.[9] Additionally, it is difficult to fault the court when at the time in question it requested that defense counsel provide some "authority" for allowing an answer to the question. While it is not required that such authority be supplied, counsel made neither offer of proof nor suggestion to assist the court. No relief was requested. Indeed the matter was pursued no further during trial nor raised in the motion for new trial. It cannot be said the trial court is guilty of reversible error much less manifest injustice.

## VI.

This Court reviews the sentence in capital murder cases when the death penalty is

---

8. The arguments directed to the jury's emotions were not peculiar to the prosecution. The defense too made a strong appeal to the sentiment as well as the minds of the jury, including the following:

> If you look around the Courtroom, Rayfield hasn't had any family here at all—this week, he hasn't had any friends here. It's been just me and Rayfield.
>
> . . . . .
>
> I don't see how you can kill him. Rayfield is twenty-four years old.
> Now, the alternatives are, of course, fifty years in prison without parole, or the death of Rayfield. If you should let him live, he would be seventy-four years old when he got out of prison, and even though Mr. Westfall made reference to watching T.V., and going to the recreation rooms and things like that, —you get up in the morning and there are four grey walls with bars at the end of the room. People in prison are not people to associate with. People in prison get killed— it's a daily routine.
> You know, I like to fish. If I were in prison, I wouldn't see a lake or a stream—it's total restriction for fifty years. Total restriction.
> If you decide to kill him, they'll take him to the penitentiary and put him in a chair and strap him in, and pull a switch—his eyes will roll back in his head and his heart will stop and life will end. '

9. In a somewhat analogous situation of a motion for a new trial because of newly discovered evidence, testimony merely for impeachment of a witness' credibility carries little weight, and a new trial for such testimony will be refused. *State v. Taylor*, 589 S.W.2d 302, 305 (Mo.1979); *State v. Brown*, 360 S.W.2d 618, 622 (Mo.1962); *State v. Wynn*, 357 S.W.2d 936, 940 (Mo.1962); *State v. Rutledge*, 317 S.W.2d 365, 367 (Mo.1958).

imposed, § 565.014.1, and determines whether the sentence was assessed under the influence of passion, prejudice or any other arbitrary factor, § 565.014.3(1), and whether the evidence supports the jury's finding of statutory aggravating circumstances enumerated in § 565.012. § 565.014.3(2). Here the record reveals that the death sentence fixed by the jury and imposed by the court was not the result of passion, prejudice or any arbitrary factor. At the first phase of the bifurcated proceeding mandated by § 565.006, the jury returned a verdict finding appellant guilty of capital murder. In the presentence hearing that followed, neither party presented additional evidence but both argued extensively the issue of punishment. The jury was instructed on two aggravating circumstances: (1) whether the defendant murdered Mansfield Dave for the purpose of receiving money or any other thing of monetary value, § 565.012.2(4); (2) whether the murder of Mansfield Dave involved depravity of mind and that as a result thereof it was outrageously or wantonly horrible or inhuman, § 565.012.2(7). The court also instructed the jury on these mitigating circumstances: (1) whether the defendant was an accomplice in the murder of Mansfield Dave and whether his participation was relatively minor, § 565.012.3(4); (2) whether defendant acted under extreme duress or substantial domination of another person, § 565.012.3(5); (3) the age of the defendant at the time of the offense, § 565.012.3(7). The jury found beyond a reasonable doubt the existence of the second submitted aggravating circumstance and the evidence supports the jury's findings.

Appellant contends that § 565.012.2(7) is facially unconstitutional by reason of its vagueness and is violative of the due process clause of the Fourteenth Amendment to the United States Constitution and Art. I, § 10 of the Missouri Constitution. Specifically, appellant argues the phrase "depravity of mind" is impermissibly vague. However, the language of the statute and its correlative instruction are the same in all essentials to that of the seventh aggravating circumstance of the Georgia death statute. Georgia Code Annotated § 27–2534.1(b)(7). The United States has on at least two occasions examined the Georgia death penalty statute and its aggravating circumstance No. 7 and concluded the statute is facially valid. *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). As noted above, one who attacks the constitutionality of a statute bears a heavy burden which appellant has not carried. Appellant notes that during their deliberations the jury requested a definition of the phrase "depravity of mind" and this request was denied by the court. He argues this demonstrates the facial invalidity. As with any attempt to label a mental state (e.g., intent, deliberation, reasonable doubt) there can be no precise objective definition for its terms. So it is with the phrase "depravity of mind". While appellant would quarrel with the lack of further definition of terms, such does not prohibit the legislature from enacting criminal penalties graduated according to an offender's mental state. Hence, when the statute employs such words of common speech, it is the responsibility of the jury to determine if the offender acted in a manner denoting depravity of mind. In addition to the previously mentioned safeguards providing the process due found in the mandatory review provisions, § 565.014, we must review whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases considering both the crime and the appellant, which eliminates as nearly as possible capricious imposition of the death penalty. We find § 565.012.2(7), RSMo 1978, facially valid under the Missouri Constitution.

Citing *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), appellant next contends the evidence was insufficient to support a conclusion that his conduct in committing "the murder of Mansfield Dave involved depravity of mind and that as a result thereof it was outrageously or wantonly horrible or inhuman." *Godfrey*, however, rests on its unique facts. There, it was conceded defendant had not

tortured the victims nor committed an aggravated battery upon them. Yet, the death sentence rested on the jury's finding that Godfrey's actions had been "outrageously or wantonly vile, horrible or inhuman in that [they] involved ... depravity of mind...." The Court rejected such conclusion as unconstitutional, noting several facts: Godfrey's victims were family members who had caused him "extreme emotional trauma"; that in an emotional state, he had killed them instantaneously; shortly after the killing Godfrey acknowledged involvement and the heinous nature of his crime and further, Godfrey had no criminal record. On these facts Godfrey's actions were deemed not to reflect "a consciousness materially more 'depraved' than that of any other person guilty of murder."

In the case *sub judice* the State established that Newlon's conduct was outrageously or wantonly vile, horrible and inhuman. Newlon planned the robbery making elaborate preparations for the scheme. He enlisted the help of a willing accomplice, West and later a second accomplice, Williams. He also provided a 16 gauge shotgun, and sawed portions from the barrel and stock to facilitate its concealment and provide an especially dangerous short range weapon. He test fired the gun and selected for robbery a nearby convenience store where he knew its operators. Before entering the store Williams, one of the conspirators, announced he would probably have to kill Mr. Dave as Mr. Dave knew him. Hence, Newlon and Williams entered the store with the very real probability of murder in mind. They waited until all possible witnesses had left the store except the intended victim, Mansfield Dave. When they entered, Franz Williams, serving as a decoy, went to the soda case at the rear and Newlon approached Mr. Dave. When Mansfield Dave's back was turned, Newlon drew and hand cocked the gun, and when Mansfield Dave faced around, Newlon, without warning or provocation, shot him in the torso with the sawed off shotgun. Though the victim was knocked to the floor, Newlon cold-bloodedly broke open the single action shotgun, extracted the spent shell, inserted a fresh shell, closed the gun, reclosed and recocked the gun, and leaning over the counter where the victim had fallen, shot Mansfield Dave again as he lay bleeding on the floor. Once more, Newlon opened the gun and extracted the second shell, apparently to insert a third shell, however, the alarm sounded, causing him to run from the store. The second extraction indicated Mansfield Dave might have suffered a third blast from the shotgun, but for the alarm, for why else would Newlon have broken open the gun a second time and extracted the second shell except in preparation for a third shot. This was a senseless killing, a killing for killing's sake. Appellant argues there was no torture involved and thus a reversal of the death sentence is required under *Godfrey, supra.* However, it should be pointed out that if Mr. Dave was dead after the initial shot, the second blast, deliberately performed in the manner described, would have served to mutilate the corpse, a macabre purpose demonstrating depravity. If, on the other hand, Mansfield Dave was still alive, the second shot was to insure the killing, and the first blast from this sawed off shotgun must have inflicted extreme suffering. The record supports the finding of depravity. *See, Turner v. Commonwealth of Virginia*, 221 Va. 513, 273 S.E.2d 36 (1980), *cert. denied*, 451 U.S. 1011, 101 S.Ct. 2347, 68 L.Ed.2d 863 (1981). There the murderer Willie Lloyd Turner entered a jewelry store with intent to rob. He "displayed a sawed-off shotgun previously concealed ... and demanded money and jewelry." *Id.* 273 S.E.2d at 39. While the proprietor and an employee complied with the robbery demand by placing money and jewelry in a bag, a silent alarm was sounded alerting the police department. Two other parties entered the store not knowing a robbery was in progress. They too were detained by Turner. Discovering that Smith, the victim, had activated the alarm, Turner demanded it be turned off and Smith complied. Learning that one of the newcomers in the store, Alan Bain, was a policeman, Turner stated that if he saw or heard any additional police, he was going to

start killing those in the store. About that time, hearing a siren, Turner, without warning, shot Smith in the head with a revolver taken from Bain. Apparently angered or aggravated by the triggering of the silent alarm and the arrival of the police, Turner leaned over the counter and in rapid succession fired two more rounds into Smith's chest. Turner, like appellant here, had a record of prior felony convictions. The jury found his acts outrageously or wantonly vile, horrible or inhuman and that the conduct resulted from the perpetrator's depravity of mind, justifying imposition of the death penalty. The Supreme Court of Virginia affirmed. The facts in *Turner* are strikingly similar to those before us. Indeed, the killing in *Turner* was possibly more understandable because of the emotion or sense of aggravation generated by the alarm and the siren heralding the arrival of the police. The pertinent portions of the Virginia statutes are similar in all essentials to ours and the decision in *Turner* provides persuasive precedent here.

 The contentions of legal error have been denied for the reasons heretofore enumerated in this opinion. The evidence from the record substantiates the verdict. Section 565.014.7. In this capital murder case, the second decided on appeal in which the death penalty has been imposed under the current capital murder statute, we have under § 565.014.5 considered these similar cases in which both death and life imprisonment were submitted to the jury, and which have been affirmed on appeal: *State v. Mitchell*, 611 S.W.2d 223 (Mo. banc 1981); *State v. Williams*, 611 S.W.2d 26 (Mo. banc 1981); *State v. Royal*, 610 S.W.2d 946 (Mo. banc 1981); *State v. Borden*, 605 S.W.2d 88 (Mo. banc 1980); *State v. Downs*, 593 S.W.2d 535 (Mo.1980); *State v. Turner*, 623 S.W.2d 4 (Mo. banc 1981); and *State v. Mercer*, 618 S.W.2d 1 (Mo. banc 1981), *cert. denied*, —— U.S. ——, 102 S.Ct. 432, 70 L.Ed.2d 240. The evidence of Newlon's acts demonstrated a level of culpability and depraved quality supporting the jury's verdict. The cases mentioned support the af-

firmance of the death penalty in the case at bar. The sentence of death for the murder of Mansfield Dave is neither excessive nor disproportionate to the penalty imposed in similar cases considering the crime and the appellant.

Judgment affirmed.

Date of execution set for March 26, 1982.

DONNELLY, C. J., and WELLIVER, MORGAN and HIGGINS, JJ., concur.

SEILER, J., concurs in part and dissents in part in separate opinion filed.

BARDGETT, J., concurs in separate opinion concurring in part and dissenting in part of SEILER, J.

SEILER, Judge, concurring in part and dissenting in part.

I concur in result as to affirmance of the conviction for capital murder, but respectfully dissent as to the affirmance of the death penalty, for the reasons set forth below.

I

Defendant was found guilty by a jury of capital murder and sentenced to death. When the death penalty is imposed, this court has a three-fold duty: 1) we must review the guilt or innocence stage of the bifurcated trial for error; 2) we must review the sentencing stage of the trial for error; and 3) we must review independently the appropriateness of the death penalty for this particular defendant and for this particular crime. In performing the first two duties, this court acts as an appellate court, *i.e.*, it reviews the record for assignments of error. The third duty, however, is an affirmative one, which is set out in § 565.014.3, RSMo 1978.[1] This third duty requires us to examine the whole record to determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

1. All statutory references are to RSMo 1978 unless indicated otherwise.

(2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in § 565.012; and

(3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

This review is essential because, once the sentence is executed, there is no opportunity to correct it. Because I conclude that the sentence of death in this case is "excessive or disproportionate to the penalty imposed in similar cases," and that the sentence "was imposed under the influence of" passion, prejudice and other arbitrary factors, either of which is sufficient to require reversal of the death penalty, I would affirm the conviction for capital murder and reverse and remand the cause for resentencing. Section 565.014.5(2).

## II

The United States Supreme Court in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), found the challenged death penalty statutes violated the eighth amendment's guarantee against cruel and unusual punishment because the statutes were applied in a discriminatory and arbitrary manner. *Id.* at 249, 92 S.Ct. at 2731 (Douglas, J., concurring). Justice Stewart in *Furman* stated that "[t]hese death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual. For, of all the people convicted of [capital crimes], many just as reprehensible as these, the petitioners are among a capriciously selected random handful upon whom the sentence of death has in fact been imposed." *Id.* at 309–10, 92 S.Ct. at 2762 (Stewart, J., concurring). In response to *Furman*, Missouri, along with many other jurisdictions, adopted new legislation to insure that the jury would be given proper direction so that the death penalty would not be imposed in an arbitrary and capricious manner. *State v. Royal*, 610 S.W.2d 946, 950 (Mo. banc 1981). Under our statutes, a defendant charged with capital murder is tried in a bifurcated trial. Section 565.006.1, RSMo Supp.1981. The first stage involves determination of guilt; the second stage involves determination of punishment. To impose death as the punishment, the trier of fact must find beyond a reasonable doubt one of twelve statutory aggravating circumstances. Section 565.012.2, RSMo 1978 and Supp.1981 (the 1978 version, applicable to this case, lists only ten aggravating circumstances).

The jury found defendant Newlon guilty of the capital murder of Mansfield Dave. It is true that the jury *could* have found the facts as set forth on page 3 of the principal opinion as to defendant and Franz Williams entering the store together, with defendant wielding the shotgun and doing the shooting, but it is incorrect to leave the impression that the verdict of guilty means that the jury found the facts as above. On the contrary, as will be developed below, the jury could have found that the defendant, *instead of being the principal*, was an *accomplice* of Franz Williams, and that Williams did the shooting, while defendant was at the back of the store getting a soda to divert the victim's attention. Because the verdict directing instruction required only that the jury find *either* "the defendant or another" killed Mr. Dave, there is no way to determine which of the two versions the jury found as the fact. Indeed, the principal opinion points out that instruction no. 9 submitted appellant's guilt of capital murder "as an accessory" and that the instruction requires *either* that 1) defendant did the killing, or 2) aided one who did.[2]

---

2. Instruction no. 9 was as follows:

 If you find and believe from the evidence beyond a reasonable doubt:

 First, that on or about April 24, 1978, in the County of St. Louis, State of Missouri, the defendant or another caused the death of Mansfield Dave by shooting him, and

 Second, that the defendant or another intended to take the life of Mansfield Dave, and

 Third, that the defendant or another knew that they were practically certain to cause the death of Mansfield Dave, and

 Fourth, that the defendant or another considered taking the life of Mansfield Dave and

To return to the facts: The prosecutor was faced with a problem, because his only eyewitness supporting the theory that defendant fired the shots was Walter West and there were formidable credibility problems with the jury as to West. West, who had five prior convictions according to the prosecutor, was also in on the plot to rob and kill Mr. Dave and served as lookout and driver of the getaway car. He made a deal with the state whereby he was permitted to plead guilty to second degree murder and received a sentence of only ten years, which was to be served outside the state.[3]

West testified he was in an automobile, parked across the street, some forty five yards from the store front (actual measurement 157 feet). It was dark, 10:30 p. m., and the store level was five feet below the parking lot level, down two short flights of steps. The photographs which were put in evidence by the state, Exhibits 1, 2, 3 and 14, purporting to show the general area and the location of the store, would raise a question by any viewer as to whether West was in a position to see all that he testified to, although, of course, this was a question for the jury. The prosecutor many times in his jury argument sought to bolster West's credibility. He insisted that the physical evidence did not disprove West's testimony and he undertook to explain away the discrepancies between West's deposition and his trial testimony. He repeatedly urged the jury not to disregard West's testimony.

Defense counsel, as would be expected, strongly attacked West's credibility and argued the physical facts belied West's testimony as to what he claimed to see from across the street.

The principal opinion devotes an entire page to the attacks made on West's credibility.

However, the prosecutor wanted to be sure that the jury knew that they could convict defendant of capital murder even if they did not believe the witness West and did not believe that Newlon personally killed Mr. Dave. To that end, the state introduced defendant's videotaped confession. In this statement, defendant admitted that he helped saw off the shotgun; that he knew Franz Williams intended to get money from the man; that Williams said he (Williams) might have "to shoot him because he knows me"; that defendant was sent to the back of the store to get a soda to divert Mr. Dave's attention; that defendant was at the back of the store when he heard the two shots; that Franz Williams had the shotgun, which he concealed under his coat when they got out of the car; and that Williams was the triggerman.[4] Under this statement, of course, defendant would be guilty of capital murder as an accomplice, which the prosecutor recognized, submitted to the jury in the main instruction, and argued.

In his argument to the jury in the guilt phase of the case, the prosecutor on at least seven occasions stressed the voluntary character of defendant's confession and emphasized that, even if West were not to be believed, the defendant by his own statement was still guilty of capital murder as an *accomplice* of Williams. For example: "I hope you're not going to disregard his confession . . . Rayfield was involved up to his neck." "[H]e didn't know when he gave that videotape statement, that he said more than enough to convict him and convict himself of capital murder." "Either Franz Williams killed him and Rayfield was in the

reflected upon this matter coolly and fully before doing so, and

Fifth, that the defendant acted either alone or knowingly and with common purpose together with another in the conduct referred to in the above paragraphs, then you will find the defendant guilty of capital murder.

However, if you do not find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.

3. The prosecutor in closing argument said, "Walter West got a deal—and quite frankly something I apologize to you for. It's one of the regrets I have. Walter West got far too good of a deal, and it's unfortunate that he'll get off with ten years. . . ."

4. Franz Williams was not called as a witness by either side and did not testify in the Newlon trial.

back of the store—which he said in the videotape, or Rayfield Newlon did the killing and Franz Williams was in the back of the store? Which is what?" "If you don't believe Walter West, we still have the videotape confession, wherein the man admits to two good police officers after he voluntarily surrenders ... and he thought he had just admitted to a robbery, but not a murder." And finally, just before bringing his final argument to a close, "but even if you disregard everything Walter said ... but regardless you got the videotape confession where he admits he was involved in the robbery and all through this confession he remarks that he knew a robbery was going to occur and involving a sawed-off shotgun, and that shotgun was pulled out before they went in the store and Franz said he might have to kill him."

As said earlier, the instruction on capital murder was in the disjunctive. It required only the jury find *either* "the defendant or another" killed Mr. Dave. To reach its verdict, the jury could have found that *either* Franz Williams or Rayfield Newlon shot and killed Mansfield Dave with two blasts of a shotgun during the course of a robbery. The jury could have found that the accomplices realized before entering the Conveniency House that they might need to kill Dave to prevent identification and thus had the requisite mental state. The jury could have believed defendant's videotaped statement, a copy of which they requested and received during deliberations, and disbelieved Walter West's testimony and still found defendant guilty under the instructions and principles of accomplice liability.[5] From the verdict it is impossible to determine whether the jury believed defendant to be guilty as a principal or as an accomplice. It therefore cannot be assumed, as the principal opinion does, that defendant was the triggerman. This is important because it bears directly on the question of whether the death sentence is disproportionate compared to similar cases

considering both the defendant and the crime. The principal opinion does not attempt to justify the death penalty for defendant if he were guilty of capital murder as an accomplice.

### III

Neither the state nor the defendant presented further evidence in the punishment stage of the trial, but both counsel argued to the jury. The state argued and submitted two aggravating circumstances to the jury: 1) "Whether the defendant murdered Mansfield Dave for the purpose of receiving money or any other thing of monetary value"; and 2) "Whether the murder of Mansfield Dave involved depravity of mind and that as a result thereof it was outrageously or wantonly horrible or inhuman." The jury, in sentencing the defendant to death, found only the latter aggravating circumstance—"the murder of Mansfield Dave involved depravity of mind and that as a result thereof it was outrageously or wantonly horrible or inhuman." During its deliberations, the jury requested a definition of "depravity of mind." This request was denied.

Section 565.012.2(7) allows the jury to impose the death penalty if it finds that "[t]he offense was outrageously or wantonly vile, horrible or inhuman in that it involved torture, or depravity of mind." This aggravating circumstance requires a subjective, rather than an objective, finding by the jury. Theoretically, a jury could find that every intentional, deliberated murder involves "depravity of mind."

An aggravating circumstance similar to § 565.012.2(7) is found in the death penalty statutes of several states. The Georgia version, which authorizes imposition of the death penalty if "the murder was 'outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or an aggravated battery to the victim'", Ga.Code Ann. § 27–2534.1(b)(7)

---

5. The prosecutor, after the jury had returned a verdict of guilty of capital murder, in his punishment stage argument stated, "By returning your verdict in this case ... that either means

that you believe beyond a reasonable doubt that he pulled the trigger, or that he had the frame of mind that's consistent with pulling the trigger ..."

(1978), was challenged in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) as being so broad that it would authorize imposition of the death penalty in every murder case. *Id.* at 201, 96 S.Ct. at 2938. In response, the United States Supreme Court stated that "[i]t is, of course, arguable that any murder involves depravity of mind or an aggravated battery. But this language need not be construed in this way, and there is no reason to assume that the Supreme Court of Georgia will adopt such an open-ended construction." *Id.* *Gregg* was followed by *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) where the petitioner's death sentence based on § 27–2534.1(b)(7) was reversed because "[t]here is no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not." *Godfrey v. Georgia*, 446 U.S. at 433, 100 S.Ct. at 1767. The Georgia court, construing § 27–2534.1(b)(7) so that it would not become a "catch-all", stated that:

> Under the plain meaning of the statute, not only must the murder be outrageously or wantonly vile, horrible or inhuman, but in addition, the facts of the case must show either an aggravated battery to the victim, torture of the victim, or depravity of mind of the defendant as hereinafter explained.

*Hance v. State*, 245 Ga. 856, 268 S.E.2d 339, 345, *cert. denied*, 449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 611 (1980). Both the principal opinion and *State v. Mercer*, 618 S.W.2d 1, 5 (Mo. banc 1981) emphasize that our death penalty statute is patterned after the Georgia statute.

This court, too, must construe this aggravating circumstance in such a way that the death penalty is not authorized for every intentional murder. It must insure that there is a principled way to distinguish between cases where the death penalty is or is not imposed. To make its proportionality review as required by statute, § 565.014.-3(3), this court must look at "the penalty imposed in *similar* cases, considering *both the crime and the defendant.*" (Emphasis added.) This court should look at sentenc-ing patterns in similar cases. *See Blake v. Zant*, 513 F.Supp. 772 (S.D.Ga.1981).

To begin, we cannot be sure whether defendant or Franz Williams actually did the shooting. There is no way to tell under the evidence, the instructions, and the verdict. Certainly if defendant were only the accomplice and not the triggerman, there is not a single Missouri capital murder case (and the principal opinion makes no effort to cite one) which can be said to be similar where the death penalty was assessed against the accomplice or which would justify our upholding the death penalty here. The alternative that defendant was found guilty of capital murder as an accomplice is not considered or discussed in part VI of the principal opinion, the proportionality review. The sole basis on which the principal opinion affirms the death penalty is on the premise that Newlon actually killed the victim. I am certain if defendant were only the accomplice, the justification of the principal opinion for upholding the death penalty, at 622, based as it is on a recital of events supposed to have been performed by defendant *as the triggerman*, must fail.

I do not mean to say, or to be interpreted as saying, that an accomplice in a capital murder could never justifiably receive a death sentence. In the case before us, however, the justification for the death sentence is found by the principal opinion in the acts committed solely by the person who did the shooting: the firing of the first shotgun blast without warning or provocation and then reloading, leaning over the counter and firing the second blast while the victim lay bleeding on the floor, followed by starting to load the gun again. While this was going on, the accomplice, who was either defendant or Williams, was at the rear of the store, getting a bottle of soda pop. There is no evidence that the accomplice had any hand in the way the actual killing was done, that it was planned between them to be done that way, or that the accomplice should have become aware that the principal was going to do it that way. As the principal opinion says, it was not necessary to do what was done in order

to accomplish the robbery. It is the way the killing itself was done which is the justification found by the principal opinion for the death sentence. Under the facts and circumstances before us, the manner of killing cannot fairly be imputed to the accomplice as a basis for sentencing him to death also.

We also point out that the aggravating circumstance submitted by instruction 19 and found by the jury does not require that the jury make any determination as to whether defendant was the triggerman or the accomplice. The question posed to the jury by instruction 19 was "Whether the murder of Mansfield Dave involved depravity of mind and that as a result thereof it was outrageously or wantonly horrible or inhuman". This inquiry focuses on the act of murder itself, not on who was the murderer. The jury could believe the murder involved depravity of mind and was outrageously or wantonly horrible or inhuman without being required to determine whether it was defendant's "depravity of mind." The portion of the verdict specifying the aggravating circumstance found reads as follows:

[W]e designate the following aggravating circumstance or circumstances which we find beyond a reasonable doubt:

Whether the murder of Mansfield Dave involved depravity of mind and that as a result thereof it was outrageously or wantonly horrible or inhuman.

This verdict does not resolve the question of whether defendant or Franz Williams committed the acts upon which the principal opinion rests its justification of the death penalty.

However, even if we assume, as does the principal opinion, that defendant fired the shots (something which we cannot assume under the instructions and verdict), the death penalty is disproportionate to the penalty imposed in similar or worse cases.

The prosecutor and the principal opinion characterize this murder as an "execution-type" killing. However, it is the *facts* of the respective homicides which we must examine, not the catch phrase applied to

them, because under our statute we are to examine proportionality of the sentence imposed to that imposed in similar cases. How do the *facts* of the killing of Mr. Dave and the punishment assessed against this defendant compare with the facts and punishment assessed in other cases where the defendant was convicted of capital murder?

The principal opinion cites cases it has compared with the instant case in determining that the death sentence is not disproportionate when applied to defendant Newlon for this particular crime compared to the penalty imposed in similar cases. In other words, it has made an attempt to distinguish cases on the assumption that defendant did the actual killing. *State v. Mitchell,* 611 S.W.2d 223 (Mo. banc 1981), is the first case cited. In *Mitchell,* the defendant was found guilty of *two* counts of capital murder committed during the course of a robbery of a liquor store. Both victims had been stabbed, one six to eight times and the other approximately twelve times. Both victims also had severe blows to the head. The jury was instructed on four aggravating circumstances, including "the offense was outrageously or wantonly vile, horrible or inhuman in that it involved torture or depravity of mind." Because the jury was unable to agree on punishment, the defendant was sentenced to life imprisonment without chance of probation or parole for fifty years. Section 565.008.1.

A second case cited is *State v. Royal,* 610 S.W.2d 946 (Mo. banc 1981). In *Royal,* the defendant during the robbery of a bank abducted an employee, took her to a remote area in the county, and killed her. The victim had been shot three times with a .22 caliber gun. The jury, after being instructed on three aggravating circumstances, including § 565.012.2(7), recommended a life sentence.

A third case cited is *State v. Downs,* 593 S.W.2d 535 (Mo.1981). In *Downs,* the defendant was convicted of *three* counts of capital murder. Downs and two co-defendants entered a store to rob it. The husband and wife, owners of the store, were shot in the head. Their daughter, returning home

from school, was pulled into the building and *shot despite her pleas for mercy.* The jury, instructed on three aggravating circumstances, including § 565.012.2(7), recommended a life sentence. Downs was identified as the *triggerman* by one of his accomplices.

I cannot find a principled means to distinguish between the three cases cited which are similar factually and the instant case which would justify sentencing Rayfield Newlon to death, yet justify sentencing defendants Mitchell, Royal, and Downs to life imprisonment. In fact, looked at objectively, the murders in the cited cases were more "vile" and the murderers exhibited a greater "depravity of mind." In *Mitchell*, there were two victims, both killed by multiple blows and stab wounds. In *Royal*, the victim was kidnapped and driven to a remote rural area, a ride which must have become increasingly terrifying and ominous, prior to being shot three times. In *Downs*, there were *three* victims. In the instant case, there was one victim, killed by two shotgun blasts. In addition, there is no way to know whether Newlon was the triggerman or whether he was an accomplice.

A fourth case cited is *State v. Williams*, 611 S.W.2d 26 (Mo. banc 1981). In *Williams*, the defendant, after repeated efforts had successfully solicited an acquaintance to kill her husband. The jury recommended life imprisonment. The only similarities to Newlon are that someone was killed, the defendant was convicted of capital murder, and the death penalty was sought, unless, of course Newlon was an accomplice. If so, I cannot see how the depravity of mind of Mrs. Williams as an accomplice in arranging for the paid murder of her husband was any less reprehensible than Newlon's as the accomplice of Franz Williams, yet she received only life imprisonment.

The fifth case cited is *State v. Mercer*, 618 S.W.2d 1 (Mo. banc 1981). In *Mercer*, the defendant was convicted of capital murder. The victim was sexually abused by the defendant and others for an extended period of time and then strangled. Witness Campbell testified that he "found defend-

ant straddling Karen's body with his hands on her throat. Defendant screamed at Campbell to take her pulse. Campbell grabbed the arm of Karen's seemingly lifeless body and found a faint pulse. At the time he told defendant this, he could smell human waste which was all over the bed. Defendant 'hollered,' struck the left side of Karen's head, and said, 'Die you bitch . . . . This is a leaky cunt. Die.' He continued strangling her, and again screamed at Campbell to take her pulse. Campbell found no pulse. When Campbell reported this, defendant got off the bed, grabbed Karen's legs, and pulled her off the bed. Defendant took the sheets and blankets to the washing machine and told Campbell to wipe the waste off the floor." *Id.* at 4. The jury, instructed on two aggravating circumstances, including § 565.012.2(7), returned the death penalty, which this court affirmed. The shooting of victim Dave by means of two shotgun shells during the course of an attempted robbery does not begin to equal the moral depravity exhibited by the defendant in *Mercer*, shown by the atrocities inflicted on his victim and set out above.

To achieve true proportionality review, we need to examine capital murder cases other than the few mentioned in the principal opinion and discussed above. *Cf. Ross v. State*, 233 Ga. 361, 211 S.E.2d 356, 359 (1974), *cert. denied*, 429 U.S. 873, 97 S.Ct. 190, 50 L.Ed.2d 154 (1976) (as earlier pointed out, our death penalty statute is patterned after Georgia's and has the same provisions as to independent review of the death penalty, including determination of proportionality of the death sentence) where the court stated "that nothing in the statute forecloses this court during the course of its independent review from examining non-appealed cases and cases in which the defendant pleaded guilty to a lesser offense." Even if we go no further in Missouri than to examine only cases we have heard on appeal and affirmed, we should include such cases as *State v. Bostic*, 625 S.W.2d 128 (Mo.1981); *State v. Baskerville*, 616 S.W.2d 839 (Mo.1981); *State v. Holmes*, 609 S.W.2d 132 (Mo. banc 1981);

*State v. Strickland,* 609 S.W.2d 392 (Mo. banc 1980); *State v. Ingram,* 607 S.W.2d 438 (Mo.1980); *State v. Hudgins,* 612 S.W.2d 769 (Mo.1981); *State v. White,* 621 S.W.2d 287 (Mo.1981); *State v. Jensen,* 621 S.W.2d 263 (Mo.1981); *State v. Chandler,* 605 S.W.2d 100 (Mo. banc 1980); and *State v. Borden,* 605 S.W.2d 88 (Mo. banc 1980). Otherwise, as set forth in *Godfrey v. Georgia, supra,* as the law is built up in this area, there is no way to distinguish a capital murder case in which the death penalty is imposed from the many cases in which it was not. We must establish standards for imposition of the death penalty to "serve both goals of measured, consistent application and fairness to the accused." *Eddings v. Oklahoma,* —— U.S. —— at ——, 102 S.Ct. 869 at 874, 71 L.Ed.2d 1 (1982).

In *Bostic,* defendant struck the victim on the head twice, then he and his son *dragged her down the alley* and loaded her in a van. The defendant *stepped on the victim's throat* when she regained consciousness. At some time defendant *had sexual intercourse* with the victim. The body was left in a ditch outside of town. The jury, instructed on the depravity of mind aggravating circumstance, recommended a life sentence.

In *Baskerville,* the defendant was convicted of *three* counts of capital murder. One victim was shot twice, one was shot once, and a third, *a child who begged for his life,* was shot once. The jury imposed the life penalty without possibility of parole for fifty years for the capital murders of the two adults and, because the jury was unable to agree upon punishment for the capital murder of the child, the court assessed a life sentence, without possibility of parole for fifty years.

In *Holmes,* defendant stabbed his sixteen year old victim at least *sixty-four* times with an ice pick like instrument, an example of extreme torture and cruel death. It is hard to imagine a worse death for a teenager. Defendant *had twice announced his intention to kill the victim,* even saying that he was going to do it by stabbing the victim with an ice pick some sixty odd times. Because the state had waived the death penalty, Holmes was sentenced to life imprisonment.

In *Strickland,* defendant was convicted of one count of capital murder and two counts of second degree murder. The victims were tied and then shot with a pistol and a shotgun. *Three were killed* and one wounded. The defendant and two or three others had intruded upon a party and also ransacked the house. The state waived the death penalty after the guilty verdict.

In *Ingram,* defendant shot and killed a casual acquaintance as he, the victim and their two consorts were driving around Bull Shoals Lake. All had been drinking beer. An argument ensued between defendant and the victim, who was driving. Defendant said he would use the shotgun on the victim if the latter did not stop the car and let him out. The victim in effect said to go ahead, "if you've got the guts", whereupon *defendant shot the victim in the head with a sixteen gauge shotgun.* The state waived the death penalty.

In *Hudgins,* defendant's landlord died from loss of blood after he stabbed her *twenty-one times as well as strangling her.* Some of the wounds were seven inches deep. Defendant *then strangled her six year old son* with an extension cord and placed the body in a bathtub filled with water. He was found guilty by a jury of capital murder, but sentenced only to life imprisonment without parole for fifty years. He was also convicted of second degree murder.

In *White,* defendant agreed to commit murder for hire. He made an *unsuccessful attempt wherein he shot the victim and beat her with a lead pipe.* After the victim recuperated, defendant entered her home, *bound and sexually ravished her* and then killed her by *cutting her throat from ear to ear* and the back of her neck, *nearly severing her head from her body.* Defendant was convicted of capital murder and the jury assessed life imprisonment without parole for fifty years.

In *Jensen,* defendant robbed the safe in the restaurant where he worked. He then

proceeded to ransack the premises to make it appear a burglary had occurred but was surprised by the arrival of the manager. *After an unavailing attempt to dissuade the manager from calling the police, defendant shot and killed her.* He was convicted of capital murder and the jury assessed punishment at life without possibility of parole for fifty years.

In *Chandler*, defendant was convicted of capital murder. The jury assessed life imprisonment without parole for fifty years. The facts were that he and two others went to the law office of the victim at night. Defendant held a gun on the victim and took his money. Then, rather than shooting the victim and possibly attracting the attention of outsiders, *defendant first stabbed the victim in the stomach* (to get defendant's hands away from protecting his throat) and then *while the victim was imploring God not to let the man kill him, defendant deliberately cut the victim's throat.*

In *Borden*, defendant wife, after failing over a period of several months to induce the man with whom she was having an affair to do the *job, executed her husband by shooting him with a sawed-off .22 caliber rifle while he was watching television. Their two children were also present in the house. Defendant had her paramour strike her and tie up the children in an attempt to divert suspicion.* Defendant was convicted of capital murder and the jury fixed the punishment at life imprisonment without possibility of parole for fifty years.

The capital murders in the ten cases just described constitute a veritable "chamber of horrors". The instant case falls far short of these capital murders (many of which involved multiple victims) in terms of torture, duration of the victim's suffering, nature of the wounds, agony, or infliction of pain and suffering. Yet in not one was the death penalty assessed. Where is the proportionality or the consistency or the principled manner by which we can declare that the sentence of death in the case before us is not excessive or disproportionate when compared to the penalty imposed in the above

cases, all of which involved depravity and conduct outrageously or wantonly horrible or inhuman? How do we distinguish in a principled way this case, where the death penalty is based on the aggravated circumstance that the murder "involved depravity of mind and that as a result thereof it was outrageously or wantonly horrible or inhuman", from those above? Is the *Mitchell* case, or *Royal*, or *Downs*, or *Williams*, or *Bostic*, or *Baskerville*, or *Holmes* or *Strickland* or *Ingram* or *Hudgins* or *White* or *Jensen* or *Chandler* or *Borden* any less depraved or less outrageously or wantonly horrible or inhuman than the present case? That question cannot be answered affirmatively, in my opinion.

As the Supreme Court of the state, we are obliged by law to examine the sentence of death to make sure that it is not excessive or disproportionate to the penalty imposed in similar cases. This the jury is not required or able to do. If Newlon's death sentence is affirmed, he is being marked for death capriciously, one randomly selected from a group of capital murderers whose crimes are of equal or greater depravity than his. We will thereby permit the jury verdict to accomplish what our death penalty review is supposed to avoid—application of the death penalty in an arbitrary and capricious manner—contrary to the mandate of our statute and the decisions of the United States Supreme Court. The Supreme Court in *Eddings v. Oklahoma, supra*, reaffirmed this mandate, stating that the decisions of the Court reflect "the Court's insistence that capital punishment be imposed fairly, and with reasonable consistency or not at all." 102 S.Ct. at 875.

The court in *State v. Culberth*, 390 So.2d 847 (La.1980) reversed the defendant's death sentence and remanded for resentencing. Defendant was found guilty of killing a young woman. The state asserted that "the infliction of five stab wounds on the helpless victim constituted an especially heinous, atrocious or cruel manner of killing." *Id.* at 850. The court, in holding that the evidence did not support submission of this circumstance, stated:

Obviously, it was not intended that all murders fall in this category, even though it can be said that murder, itself, is a heinous, atrocious and cruel crime. We have stated that the concept of heinousness must necessarily include "some idea of torture or the pitiless infliction of unnecessary pain on the victim." *State v. English*, [367 So.2d] [815] at 823 [ (La. 1979) ]. Such a construction is necessary to protect the statute from attack on grounds of vagueness and overbreadth and to provide adequate guidelines for those involved in the sentencing process. *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). In this case the defendant did not torture or abuse the victim before her death. The wounds were inflicted to kill, not to maim or to inflict pain.

*Id.* at 851.

Whether we conclude the evidence does not support imposition of the death penalty or that the sentence is disproportionate for the crime, the death penalty cannot be imposed. As in *Culberth*, this was a killing with intent to kill, not with intent to maim or wound. This is recognized by the prosecutor in closing argument when he argued that Newlon shot Mr. Dave a second time "to make sure nobody would live to identify him in the Courtroom." The principal opinion speculates the second shot fired was to mutilate the corpse, but there is no evidence to support this, nor was any such theory advanced by the prosecutor to the jury. If the killer were truly motivated by a desire to mutilate, he would have fired the second shot into the deceased's head and face, not his shoulder.

"The instantaneous death of a victim as a result of being killed by a gunshot, although the scene of death be gruesome (no other facts appearing), does not constitute torture, aggravated battery or depravity of mind." *Hance v. State, supra,* 268 S.E.2d at 346. In this case, there were "no other facts appearing", other than the characterization by the prosecutor and principal opinion that this was an "execution-style kill-

ing." The sawed-off shotgun was, most definitely, a lethal weapon, but it is a weapon used to kill, not to torture. Its use results in a bloody, gruesome scene as shown by the photographs entered into evidence by the state (Exhibits 7, 8, and 9). This does not, however, reflect "depravity of mind" any more than the use of any other weapon. The principal opinion would supply "other facts" by pointing out that this was a single action shotgun and thus required reloading. The gun is a simple self-ejecting weapon, easy to load, and would require, at the most, a few seconds to fire and reload.

The principal opinion relies on *Turner v. Commonwealth*, 221 Va. 513, 273 S.E.2d 36 (1980) to support its position that the death penalty is appropriate in this case. In *Turner*, the jury found both statutory "[c]onditions for imposition of death sentence": 1) "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing serious threat to society" or 2) "that his conduct in committing the offense for which he stands charged was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim." Va.Code § 192–264.2 (Supp.1981). I am unable to agree with the principal opinion that the facts in *Turner* are "strikingly similar to these before us." *Turner*, during the course of a robbery, held four people hostage, (including a police officer) in the store for a short period of time. He shot the owner in the head, wounding him but not fatally, and then talked to one of the hostages. Two of the hostages escaped after which Turner told the officer that he was going to kill the owner because he had set off an alarm. Turner then fired two shots at the owner which were fatal. Additionally, Turner had a history of violent crime.[6] He had been convicted of malicious maiming, escape, unlawful wounding, malicious wounding, and second degree murder. *Id.* 273 S.E.2d at 44, n.11. The defendant argued that the evidence did not support the

6. Newlon did not. His prior crimes were burglary, stealing and larceny.

"vileness" condition. In response, the court stated that the initial wound to the head, which was not the cause of death, was an aggravated battery. But, it added, that "[e]ven if Turner's crime did not meet the 'vileness' standard, imposition of the death penalty would be permissible under the 'dangerousness' standard." *Id.* at 45. The court pointed out that defendant's criminal record "is one of the most extensive we have reviewed" under this provision of the statute. *Id.* at 47. This case is clearly distinguishable: 1) the jury found two statutory aggravating circumstances; 2) the defendant in Turner had a history of violent crime which Newlon did not; and 3) the opinion relies mainly on the "dangerousness" aggravating circumstance, which is not the aggravating circumstance relied upon here.

### IV

In addition, I would reverse the death sentence and remand for resentencing because the sentence of death was imposed under the influence of passion, prejudice, and other arbitrary factors, § 565.014.3(1), generated in the minds of the jurors by the improper and provocative words of the prosecutor. I must conclude that the prosecutor overstepped all bounds of permissible argument by injecting appeals to the passions and prejudices of the jurors and appeals for return of the death sentence for reasons foreign to the clear mandate of our death penalty statute that death can properly be assessed only if there is a sufficient aggravating circumstance or circumstances and for no other reason. Section 565.012. In so doing, the prosecutor violated the ABA Standards for Criminal Justice, Standards 3–5.8(c) and (d) which state:

(c) The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.

(d) The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law.

As was stated in *United States v. Sanders,* 547 F.2d 1037, 1043 (8th Cir. 1976), "Prosecutors may strike hard blows but not foul ones."

Most, if not all, of the arguments set forth, *infra* were not objected to. Our duty, however, under § 565.014, is to determine whether the death sentence was imposed under the influence of "passion, prejudice, or other arbitrary factor." The absence of an objection does not relieve us of the affirmative duty to make our own independent appraisal, nor does the mere absence of an objection change the nature of what was said and its effect upon the jury. The remarks of the prosecutor to which I refer below were not casual remarks. They were made to make an imprint on the jury, to obtain a death verdict for the reasons advanced. We should not permit a death verdict to stand where illegitimate argument formed a·major part of the prosecutor's appeal to the jury.

First, the prosecutor argued that the jury should impose the death penalty because it had not been imposed previously under our present death penalty statute, clearly a non-statutory ground and constituting no legitimate reason why this defendant should be singled out. This argument focuses on making use of the death penalty just because it has not yet been used, not on its appropriateness for Rayfield Newlon.

Do you know how many people are on death row in this State? None. We've got the death penalty, but how many are there? None. Mr. Newlon will be the first one, if you put him on death row.

Second, the prosecutor appealed to the jury's sense of not wanting to seem "gutless" by asking them to return the death penalty to demonstrate they had the courage to do so. This is not a justifiable reason for sentencing defendant to death.

As sure as he sits there, he doesn't think you have the guts to do it.

\* \* \* \* \* \*

Once again, I hope you have the courage to do that [return the death penalty] because it's tough.

Third, the prosecutor misstated the law by arguing that the death penalty was appropriate solely because the defendant had been convicted of capital murder; that because he had killed someone he deserved in return to die. Under this argument, the jury is urged to look no further than guilt of capital murder. This is not the law.

> But, if somebody is guilty of capital murder the ultimate crime, why should they get anything other than death?

> \* \* \* \* \* \*

> Now, there are questions on whether it deters or not, but let me say this to you: if it doesn't deter crime by taking Mr. Newlons' life, and it doesn't deter anyone else out in the community—what harm had been done? . . . At the very worst, if it doesn't, you have simply given Rayfield what he deserves and that's an "eye for an eye and a tooth for a tooth" and that's what, I submit, this is all about, and I submit to you, that there is nothing wrong with that.

Fourth, the prosecutor argued the jury should impose the death penalty rather than life without parole for fifty years, because if the latter were selected there was no assurance the legislature might not change the law or that the sentence might not be commuted. These speculative possibilities do not constitute aggravating circumstances. Under this line of argument, life imprisonment without parole for fifty years would never be an appropriate punishment.

> [T]hat's no big deal . . . what assurances do you have that he'll be there fifty years? The legislature could change the law. All it says is no parole. It doesn't say it can't be commuted. There's no assurance of that at all.

Fifth, the prosecutor sought to inject an implication as to what the trial judge's personal feelings were about what punishment should be assessed by ostensibly explaining what the law was if the jury could not arrive at a unanimous decision, but leaving the impression that if the trial judge had his way the sentence would not be life:

> The Judge in his instructions is going to tell you that you have two choices. . . . [I]f you can't come to a unanimous decision, he then will impose sentence, which will be a life sentence without parole for 50 years. Now, I want you to understand that Judge Ruddy is required by law to give you that Instruction. . . . Now, that in no way is meant to indicate his Honor's personal feeling as to what the sentence should be. So, don't interpret that to mean that the Judge in this case feels Rayfield Newlon's punishment should be life, and not death.

Sixth, the prosecutor sought to relieve the jury of taking full responsibility for its verdict by directing their attention to post trial procedures. The jury is supposed to decide the issue of appropriate punishment on the evidence before them, not on the basis that it is possible the reviewing authorities may temper their verdict later on.

> Now, if you say he deserves the death penalty, under the law, Judge Ruddy must review it and if he agrees, then his decision is reviewed by the Supreme Court.

The question before the jury at the punishment stage was whether there was present an aggravating circumstance sufficient to warrant the imposition of death. Section 565.012.5. The prosecutor, by these improper arguments, diverted the jury from consideration of its statutorily defined duty to consideration of arbitrary and emotional factors. These arguments had a direct bearing on the verdict, *as they were intended to have.* This is sufficient reason to reverse the death sentence. But, of even greater importance is the conclusion that, when we compare this capital murder to the many other horrible capital murders we have affirmed on appeal where the punishment assessed was life without possibility of parole for fifty years, not death, the death sentence is a disproportionate penalty for this particular crime and for this particular defendant, even if he were the actual killer, and especially so when we cannot know whether the jury decided the defendant was the triggerman or the accomplice.

I would reverse the death penalty and remand for resentencing.